Eugene BROXTON, Appellant,

v.

The STATE of Texas, Appellee.

No. 71488.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 4, 1995.

Rehearing Denied Nov. 15, 1995.

Ken J. McLean, Roy G. Romo, Houston, for appellant.

Rikke Burke Graber, Assistant District Attorney, Houston, Robert A. Huttash, State's Atty., Austin, for the State.

---

## OPINION

KELLER, Judge.

Appellant was convicted of capital murder. Tex.Penal Code Ann. § 19.03(a)(2). After the jury affirmatively answered the first and second Special Issues and negatively answered the third Special Issue, the trial court assessed the death penalty.[1] Direct appeal to this Court is prescribed by article

---

1. After the punishment phase of the trial, the following Special Issues were proffered to the jury:

Was the conduct of the defendant, Eugene Broxton, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased would result?

Is there a probability that the defendant, Eugene Broxton, would commit criminal acts of violence that would constitute a continuing threat to society?

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do

37.071(h) of the Texas Code of Criminal Procedure. Appellant raises eight points of error.

## I. First Point of Error

In his first point of error, appellant claims he is entitled to a new trial because the jury questionnaire forms do not appear in the appellate record. *See Perez v. State,* 824 S.W.2d 565 (Tex.Crim.App.1992) (ordering new trial where court reporter's tapes and notes lost); *Payne v. State,* 802 S.W.2d 686 (Tex.Crim.App.1990) (ordering new trial where testimony of three witnesses missing from record); *Emery v. State,* 800 S.W.2d 530 (Tex.Crim.App.1990) (ordering new trial where pretrial hearing notes lost); *Dunn v. State,* 733 S.W.2d 212 (Tex.Crim.App.1987) (ordering new trial where portion of pretrial hearings, voir dire, and testimony of witness missing). According to appellant, these forms should have been included in the record on appeal because they were admitted into evidence and were the subject of a timely request for inclusion. Appellant contends that a new trial is required because he exercised due diligence in requesting the forms, and neither he nor his counsel caused the appellate record to be incomplete.

The State argues that the forms were not admitted into evidence and not designated to be included in the record on appeal. The State further contends that appellant failed to exercise due diligence in securing the questionnaires for inclusion in the record.

Texas Rule of Appellate Procedure 50(e)[2] provides that, in order to prevail, an appel-

lant must show (1) he made a timely request for a statement of facts and (2) the court reporter's notes and records have been lost or destroyed without the appellant's fault. *See Culton v. State,* 852 S.W.2d 512, 514 (Tex.Crim.App.1993). Under Rule 53(a),[3] a "timely request" is a request made in writing to the official court reporter on or at the time prescribed for perfecting the appeal. *Id.*

■ In addition to the stated requirements of Rules 50(e) and 53(a), this Court has historically required defendants to demonstrate due diligence in attempting to secure a complete statement of facts. *Id.; Dunn,* 733 S.W.2d at 214; *Austell v. State,* 638 S.W.2d 888, 890 (Tex.Crim.App.1982); *Timmons v. State,* 586 S.W.2d 509, 512 (Tex. Crim.App.1979). Appellants demonstrate due diligence if they (1) obtain the missing portion of the record and file a motion to supplement the record, or (2) obtain an affidavit from the court reporter explaining the absence of the missing portion of the record and file a motion to supplement the record supported by the affidavit. *Culton,* 852 S.W.2d at 515; *see* Tex.R.App.P. 55.

■ Appellant in the instant case has not complied with the requirements of Rules 50(e) and 53(a) nor demonstrated due diligence. First, there is no evidence in the record that appellant made a written request to the court reporter designating the portions of the evidence to be included in the appellate record. In his brief, appellant claims he filed a designation letter with the Harris County District Court Clerk wherein he requested the clerk to include all exhibits introduced into evidence at trial in the record on appeal. Appellant also claims that the designation letter was the subject of a Motion to Supplement the Transcript filed with

you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?
Tex.Code Crim.Proc.Ann. art. 37.071.

**2.** Texas Rule of Appellate Procedure 50(e) provides:

When the record or any portion thereof is lost or destroyed it may be substituted in the trial court and when so substituted the record may be prepared and transmitted to the appellate court as in other cases. If the appellant has made a timely request for a statement of facts,

but the court reporter's notes and records have been lost or destroyed without appellant's fault, the appellant is entitled to a new trial unless the parties agree on a statement of facts.

**3.** Rule 53(a) of Appellate Procedure provides in pertinent part:

The appellant, at or before the time prescribed for perfecting the appeal, shall make a written request to the official reporter designating the portion of the evidence and other proceedings to be included therein.

this Court. However, no such letter or motion appears in the transcript or among the papers filed with this Court. Second, even if appellant made a timely written request, he did not file a motion to supplement the record supported with either the missing portions of the record or an affidavit from the court reporter explaining the absence of the missing portions. Therefore, appellant is not entitled to a new trial.[4] Appellant's first point of error is overruled.

## II. Second Point of Error

Appellant's second point of error concerns the voir dire examination of venireperson Dwayne Edward Nolan. Appellant complains that the trial court improperly sustained the State's challenge for cause of Nolan.

■ At the onset of his voir dire examination, Nolan indicated to the court that he did not have any conscientious, religious, or moral scruples against the infliction of death as a

punishment in a proper case. The State inquired about Nolan's juror questionnaire form in which Nolan checked a statement that he was opposed to capital punishment under any circumstances as the one statement that best summarized his general views about capital punishment. In response to the State's questions, Nolan initially stated that he was opposed to capital punishment under any circumstances, but then stated that it would depend on the circumstances of the case.[5] Nolan later indicated that he believed life imprisonment was a more effective punishment than the death penalty.

The State questioned Nolan extensively about how he would answer the third special issue. Nolan responded that he would have a tendency to answer the issue "yes" so that a life sentence would be imposed.[6] When questioned by the trial court regarding this testimony, Nolan testified repeatedly that he absolutely could not put aside this bias in answering the issue.

---

4. We do not reach the issue of whether the questionnaire forms were admitted into evidence and thus required to be included in the appellate record. Even if the questionnaire forms were properly admitted, appellant has not satisfied the requirements in Texas Rules of Appellate Procedure 50(e) and 53(a).

5. The State also inquired about the portion of Nolan's juror questionnaire form in which he checked a statement that he agreed that capital punishment cannot be a sane method of dealing with crime. Nolan's responses to the prosecutor's questions indicated that he did not understand what the statement meant when he checked it. For example, Nolan stated "I was understanding that that—that you can't be, like I said, disability and, you know, if you didn't have a straight head or something like that."

6. The following exchange occurred:
Q: [Prosecutor] Do you think that you would be prejudiced towards the defense in the sense that you would lean towards answering this question yes without having even heard any evidence because of the fact that you believe that life imprisonment is more effective than capital punishment or the death penalty?
A: [Nolan] No, I wouldn't.
Q: [Prosecutor] How do you feel like you would lean with regard to answering that question, if any way at all?
 * * * * * *

A: [Nolan] I would say by thinking real thoughtfully, I would say yes.

 * * * * * *

Q: [Prosecutor] So you're telling me that because of your feelings, you do think that you would tend to answer Special Issue No. 3 yes?
A: [Nolan] Yes.
Q: [Prosecutor] Okay. And that's in each and every case?
A: [Nolan] No, sir.
Q: [Prosecutor] You just think you would answer it—well, let me put it this way. You think already right now, without having heard any evidence, that you have a built-in tendency towards answering it yes; is that correct?
A: [Nolan] Yes.
Q: [Prosecutor] And that's because of what?
A: [Nolan] That's because of not hearing the case.
Q: [Prosecutor] Okay. So I take it then, what you're telling me then is as we sit here—and counsel for the defense used the word bias or—bias—that you have a built-in bias with regard to tending toward answering Special Issue No. 3 yes, even without having heard any evidence?
A: [Nolan] Yes sir.

After this line of questioning, the State challenged Nolan for cause. Then, after defense counsel explained the presentation of evidence and the requirement of affirmative answers to the first and second special issues before reaching the third, Nolan's voir dire examination continued as follows:

Q: [Defense counsel] If we get to here, and in applying your own reasoned moral judgment, you believed that there were *not sufficient* mitigating circumstances or one circumstance that was sufficient to warrant a sentence of life in prison rather than death, would you put aside any feelings you had, any bias you might have against the death penalty, and answer that the way you honestly believe?

A: [Nolan] I would answer it the way I honestly believe it, yes.

> \* \* \* \* \* \*

Q: [Court] Could you put aside any bias you have towards your feelings against the death penalty in answering that or not?

A: [Nolan] No.

Q: [Court] You could not put aside the bias?

A: [Nolan] Not the—no, not the bias.

Nolan further discussed whether he would have a tendency to answer "yes" to the third issue before he heard any evidence. He indicated that he could not set aside any bias and prejudice and decide the answer to the third issue based solely on the evidence that he heard. The trial court thereafter sustained the State's challenge for cause, and Nolan was excused from jury service.

Appellant complains that the trial court abused its discretion by applying the incorrect legal standard in sustaining the State's challenge for cause to venireperson Nolan. According to appellant, Nolan's testimony as a whole demonstrated that Nolan was qualified, notwithstanding his expressed bias toward answering the third special issue such that a defendant would receive a life sentence rather than the death penalty. Appellant contends that because Nolan also expressed a willingness to answer the third special issue based upon the evidence presented at trial, his bias would not have prevented or substantially impaired the performance of his duty as a juror.

■■■ In *Vuong v. State,* 830 S.W.2d 929, 943 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992), we held that an appellant complaining of an erroneously excluded juror must demonstrate one of two things: (1) the trial judge applied the wrong legal standard in sustaining the challenge for cause, or (2) the trial judge abused his discretion in applying the correct legal standard. The correct legal standard was articulated in *Wainwright v. Witt,* 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985), in which the United States Supreme Court held that a prospective juror may be excluded for cause only when the juror's views on capital punishment are such that they would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *See also McFarland v. State,* 845 S.W.2d 824, 833 (Tex.Crim. App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993); *Jones v. State,* 843 S.W.2d 487, 497 (Tex.Crim.App. 1992), *cert. denied* —— U.S. ——, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). However, the State is not required to prove a prospective juror's bias or prejudice with "unmistakable clarity." *Witt,* 469 U.S. at 424; *McFarland,* 845 S.W.2d at 833; *DeBlanc v. State,* 799 S.W.2d 701, 717 (Tex.Crim.App.1990), *cert. denied* 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991); *Bird v. State,* 692 S.W.2d 65, 75 (Tex.Crim.App.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). Here, the questions asked by appellant's counsel, the prosecutor, and the trial judge indicate that the trial

judge applied the correct legal standard, articulated in *Witt*, in attempting to ascertain whether Nolan would be prevented or substantially impaired in performing his duties as a juror. We now turn to the issue of whether the trial judge abused his discretion in applying the correct legal standard. *Goodwin v. State*, 799 S.W.2d 719, 731 (Tex. Crim.App.1990), *cert. denied* 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991). In reviewing the trial judge's decision to sustain the State's challenge of Nolan, we must determine whether the totality of his voir dire testimony supports the trial judge's implied finding of fact that Nolan was unable to take the requisite oath and to follow the law as given. *Id.* at 731. During this review, we recognize that we are faced with only a cold record, and that we should grant considerable latitude to the trial judge, who had the opportunity to directly observe the demeanor of the venireperson. *Vuong*, 830 S.W.2d at 943.

Initially, Nolan indicated to the State that due to his belief that life imprisonment is a more effective means of punishment than the death penalty, he would have a tendency to answer "yes" to the third special issue so that a life sentence would be imposed. In response to appellant's questions, Nolan agreed that if there were not sufficient mitigating circumstances, he would answer the third issue after hearing evidence "the way [he] honestly believe[d] it." However, when questioned by the trial court regarding this tendency, Nolan testified repeatedly that he absolutely could not put aside this bias in answering the third issue. From these responses, the trial court could reasonably infer that Nolan's ability to follow the law would be substantially impaired by his beliefs about the death penalty; therefore, his conclusion is supported by Nolan's voir dire as a whole. Accordingly, appellant's second point of error is overruled.

### III. Third and Fourth Points of Error

Appellant's third and fourth points of error concern the testimony of Christopher Jules

Shook, appellant's former roommate who testified on behalf of the State. In his third point of error, appellant claims he was denied the right to present a defense in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the Texas Constitution when the trial court ruled that appellant could not limit questioning of Christopher Jules Shook to the content of the witness' auditory hallucinations. In his fourth point of error, appellant argues that the trial court's ruling denied him due process or due course of law in violation of the Fourteenth Amendment to the United States Constitution and Article 1, Sections 13 and 19 of the Texas Constitution.

Prior to appellant's cross-examination of Shook, a bench discussion occurred regarding whether the trial court would allow the State on redirect examination to elicit testimony about extrajudicial assertions made by Shook to a clinical psychologist. Shook told psychologist Dr. Edward Silverman that he was having auditory hallucinations, which Dr. Silverman detailed in a written report. In addition to the content of the auditory hallucinations, Silverman's report included Shook's explanation for hearing voices.[7] Appellant's counsel argued that only testimony regarding the content of the hallucinations should be admitted, because Shook's explanation, while relevant, would be unduly prejudicial under Rule 403 of the Texas Rules of Criminal Evidence due to the references to extraneous offenses. The State indicated that it would not object to testimony concerning the content of the hallucinations, but if the trial court admitted such testimony, the State should be allowed to go into Shook's explanation for hearing voices pursuant to Texas Rules of Criminal Evidence 107 (optional completeness) and 612 (impeachment). The trial court ruled in the State's favor and refused to allow appellant to limit Shook's testimony.

Appellant stated on the record that, based on the trial court's ruling, he would not ques-

---

7. The report, which was later admitted as Court's Exhibit No. 1, included statements made by Shook about his experience as appellant's roommate. Shook stated that shortly after he moved in with appellant, he discovered that "lo

and behold, he turns out to be a mass murderer." Shook stated that appellant regularly brought cocaine back to the apartment, and when they were high, appellant told Shook that he had been killing people.

tion Shook about the content of the auditory hallucinations because he did not want the jury to hear the extraneous offense evidence. Appellant later made a bill of exception.[8] The State claims appellant did not properly preserve error because appellant did not obtain an adverse ruling on an objection at trial that comports with the complaint raised on appeal, citing *Turner v. State,* 805 S.W.2d 423, 431 (Tex.Crim.App.1991), *cert. denied* 502 U.S. 870, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991), and *Thomas v. State,* 723 S.W.2d 696, 700 (Tex.Crim.App.1986).

■■■ To preserve error for appellate review, the complaining party must make a timely, specific objection and obtain a ruling on the objection. Tex.R.App.P. 52(a); *Turner,* 805 S.W.2d at 431; *Thomas,* 723 S.W.2d, at 700. In addition, the point of error must correspond to the objection made at trial. *Turner,* 805 S.W.2d at 431. In other words, "An objection stating one legal theory may not be used to support a different legal theory on appeal." *Johnson v. State,* 803 S.W.2d 272, 292 (Tex.Crim.App.1990), *cert. denied* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991); *Thomas* 723 S.W.2d at 700. We have further held that even constitutional errors may be waived by failure to object at trial. *Briggs v. State,* 789 S.W.2d 918, 924 (Tex.Crim.App.1990); *Gibson v. State,* 516 S.W.2d 406, 409 (Tex.Crim.App.1974).

■■■ Here, appellant's trial objection was based on Texas Rule of Criminal Evidence 403. On appeal, appellant claims that he was denied the right to present a defense and the right to due process or course of law in violation of the United States Constitution and the Texas Constitution. We hold that appellant's complaint on appeal does not correspond to the objection made at trial, and thus appellant did not properly preserve error. *See Ellason v. State,* 815 S.W.2d 656,

665 (Tex.Crim.App.1991) (appellant did not preserve error where objection to excusal of venireperson at trial was based on various constitutional provisions and complaint on appeal was that trial court improperly excused venireperson sua sponte); *Johnson v. State,* 803 S.W.2d 272, 292 (Tex.Crim.App. 1990) (appellant did not preserve error where objection at trial to admission of bag of cocaine was that the State did not show that appellant exercised custody or control over the evidence and complaint on appeal was that admission of evidence violated Tex. R.Crim.Evid. 404(b)). Accordingly, we will not review the merits of appellant's third and fourth points of error.

## IV. Fifth through Eighth Points of Error

In his fifth and sixth points of error, appellant claims that he was denied due process and due course of law, in violation of the Fourteenth Amendment to the United States Constitution and Article 1, §§ 13 and 19 of the Texas Constitution, when the trial court disallowed punishment testimony that he would never be paroled and when the trial court instructed the jury that it could not consider the minimum time appellant would have to serve before becoming eligible for parole. In points of error seven and eight, appellant claims that the same rulings deprived him of the right to be free from cruel and unusual punishment guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Article 1, § 13 of the Texas Constitution. Appellant argues that the requested information regarding parole was relevant to whether he would be a continuing threat to society and that the trial court prevented the jury from weighing the mitigating effect of punishment testimony that appellant, given his age and past behavior in a prison setting, would not

---

8. In the bill of exception, Shook admitted to having auditory hallucinations. Shook stated that he told the psychologist that he heard appellant's voice telling him to purchase cocaine and to kill people. Shook admitted that the voice convinced him that these things were not wrong and that he felt as though a time bomb was about to explode in his head. Finally, Shook conceded that he was hearing voices as a result of his cocaine addiction and that he was addicted before he met appellant.

likely pose a future threat while incarcerated or thereafter.[9]

 In *Smith v. State*, 898 S.W.2d 838 (Tex.Crim.App.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995), this Court addressed and rejected the identical constitutional challenges posed in points six and eight. We hereby adopt the reasoning of the plurality opinion in *Smith, id.,* and follow that decision in regard to those points.

 As for points five and seven, we have previously held it improper to admit testimony concerning when or whether a defendant would be paroled. *Jones v. State*, 843 S.W.2d 487, 495 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). The reasons in *Smith* for rejecting the constitutional challenges to the exclusion of parole information apply equally well to the exclusion of parole testimony under the circumstances present in this case. Points of error five through eight are overruled.

The trial court's judgment is AFFIRMED.

BAIRD, Judge, concurring.

I concur in the resolution of appellant's second point of error for the reasons stated in *Staley v. State*, 887 S.W.2d 885, 899 (Tex. Cr.App.1994) (Baird, Overstreet and Maloney, JJ., concurring). And I concur in the resolution of appellant's fifth, sixth, seventh and eighth points of error for the reasons stated in *Smith v. State*, 898 S.W.2d 838, 855 (Tex.Cr.App.1995) (Baird, J., concurring). With these comments, I join only the judgment of the Court.

CLINTON, Judge, dissenting.

As I did in *Smith v. State*, 898 S.W.2d 838 (Tex.Cr.App.1995), I dissent to the Court's disposition of appellant's claim, in his sixth point of error, that the failure to inform the jury of the minimum period he would be incarcerated before becoming eligible for parole under a life sentence for capital murder violated his right to due process under *Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). I also dissent to the Court's disposition of appellant's second point of error, concerning the State's challenge for cause against venireman Dwayne Edward Nolan.

*I.*

As Judge Maloney and Judge Overstreet illustrates in their dissents, appellant adduced evidence from which a jury could conclude that he poses a significantly lesser danger to prison society than he does to society at large. Absent some mechanism to inform the jury of at least the minimum period of time appellant would in fact be confined to prison society, appellant was unable to emphasize for the jury the full mitigating impact of this evidence as it related to the statutory issue whether he would pose a continuing threat to society. As long as evidence has a tendency to show appellant will not pose a threat to some facet of society, due process requires that he be allowed to present it. *Simmons v. South Carolina,* supra, at —— – ——, n. 5, 114 S.Ct. at 2194–2195, n. 5, 129 L.Ed.2d at 143–144, n. 5. For reasons given in Part III of my dissenting opinion in *Smith,* I dissent today as well to the majority's disposition, such as it is, of appellant's sixth point of error.

*II.*

I also believe the trial court erred in granting the State's challenge for cause against venireman Nolan. The Court assures us that the trial court applied the correct legal standard (that is, whether Nolan was substantially impaired in his ability to follow the law), and that the record supports its "implied finding" that he was, in fact, unable to follow the law. But the Court never informs us

---

**9.** Appellant does not explain how the protection offered by the Texas Constitution differs from that of the United States Constitution. We decline to make appellant's arguments for him.

Therefore, we will address the issues solely on federal grounds. *Johnson v. State*, 853 S.W.2d 527, 533 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993).

what aspect of the law Nolan is supposed to have had a bias against. Nor does the Court demonstrate where in the record the prosecutor, as proponent of the challenge, explained to Nolan what the law would require of him before challenging him on the ground that he could not conform. This Court cannot put its imprimatur on the trial court's conduct without first showing that Nolan understood what the law expected of him, and that he was unable or unwilling to oblige.

Nolan's answers to the questions posed both by the State and appellant were fairly inartful, but from them we can glean two unvarying and unequivocal attitudes on his part. First, Nolan was perfectly able and willing to answer the third special issue contained in Article 37.071, § 2(e) in accordance with whatever evidence was presented to him. Second, without hearing any evidence at all, Nolan would be inclined, if called upon to do so, to answer that issue "yes"—which would, of course, result in the imposition of a life sentence. In ruling on the State's challenge, the trial court clearly found Nolan unacceptable because of this latter inclination, for it opined that "it was apparent from Mr. Nolan's responses that he was certainly leaning towards answering [the § 2(e) issue] yes before any issue was presented to him, and certainly before any of the facts were presented to him." But neither the trial court then, nor this Court today, bothers to explain in what respect Nolan was thus biased against the law. That is to say, no one bothers to explain why Nolan's inclination to find sufficient mitigation to justify imposition of a life sentence in the absence of any evidence constitutes a bias or prejudice against some aspect of the law upon which the State is entitled to rely. See Article 35.16(b)(3), V.A.C.C.P.

Whether Nolan's inclination to mitigate in the absence of evidence evinces a bias against the law depends in the first place upon which party, the State or the capital defendant, has the burden of proof under Article 37.071, § 2(e), supra. It is the function of a burden of proof to determine which party should prevail on a particular issue in the event the evidence relevant to that issue is in perfect equipoise. To say that no evidence has been presented on the issue is functionally the same as saying the evidence is in perfect equipoise. Either way, without assigning a burden of proof to one party or the other, we would not know how to determine the winner. Once we do assign the burden of proof, we know that in the event no evidence is presented, the party with the burden loses. By this accounting, before we can say that Nolan's inclination to answer the § 2(e) special issue "yes" in the absence of evidence amounts to an inability to follow the law, we must know which party shoulders the burden of proof on that issue. Indeed, should we hold that the burden falls upon the State, far from constituting a bias against the law, Nolan's inclination would coincide with it.

We have never expressly resolved this question of who has the burden of proof on the Article 37.071, § 2(e) issue. We came closest in *Barnes v. State*, 876 S.W.2d 316 (Tex.Cr.App.1994), where we commented on the question in passing. Barnes had argued that the trial court erred not to instruct the jury at the punishment phase of his capital murder trial that the State had a burden to negate evidence proffered in mitigation of the death penalty. This Court held that the trial court had not erred because neither the Eighth Amendment, nor any state provision implementing it, had assigned such a burden to the State. In a footnote we remarked:

> "Currently, Article 37.071 mandates that a jury that finds beyond a reasonable doubt, as required by Subsection (c), that the special issues under Subsection (b) should be answered affirmatively must go on pursuant to Subsection (e) to decide whether mitigating circumstances nevertheless warrant a life sentence. However, neither Subsection (c) nor Subsection (e) itself expressly assigns a particular burden of proof on the issue of mitigation. It might be argued, although we certainly have no occasion here to hold, that Subsection (c) implicitly assigns the burden to the beneficiary of a finding of 'sufficient miti-

gating ... circumstances to warrant that a sentence of life ... be imposed.' Cf. *Arnold v. State,* 786 S.W.2d 295, at 298 (Tex. Cr.App.1990) (State has burden of proof to establish harmless error under Tex. R.App.P. 81(b)(2), as beneficiary of the error). That, of course, would be the defendant."

*Id.,* at 330, n. 17.

I agree with the *Barnes* footnote that Article 37.071, § 2(e) assigns at least a burden of *production* to the defendant. Before a capital jury can even reach the § 2(e) issue, it must have affirmatively found the existence of aggravating facts under Article 37.071, § 2(b), for which the State expressly harbors the burden of proof, under § 2(c). Once these facts have been established to the jury's satisfaction to a level of confidence beyond a reasonable doubt, the jury proceeds to the § 2(e) special issue, *viz:* "whether ... there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment *rather than a death sentence* be imposed." (Emphasis added.) If there are *not* sufficient mitigating circumstances, the default position is that a sentence of death will be imposed. This means, of course, that it is the capital defendant who stands to benefit from the presentation of mitigating evidence. Because he is, thus, the beneficiary of mitigating evidence, the burden of production falls to him. *Arnold v. State,* supra. This necessarily means that if no mitigating evidence is adduced from any source, a rational jury would not be at liberty to answer the special issue "yes." For this reason I agree with the Court that Nolan's inclination to answer the § 2(e) issue "yes" does indeed tend to evince a bias against a phase of the law upon which the State is entitled to rely.

But this does not fully resolve the question whether the trial court erred to grant the State's challenge for cause. A venireman must be told what the law requires of him before it can be established that he cannot follow it. *Cuevas v. State,* 742 S.W.2d 331, 343, n. 12 (Tex.Cr.App.1987). That the veni-

reman harbors some attitude antithetical to the law is of no moment so long as he can lay that attitude aside and abide by the requirements of the law. The proponent of a challenge for cause has the burden of establishing his challenge is proper. *Hernandez v. State,* 757 S.W.2d 744, 753 (Tex.Cr.App.1988) (plurality opinion). The proponent does not meet that burden until he has shown that the venireman understood the requirement of the law and could not overcome his prejudice well enough to follow it. We have applied this eminently sensible principle often enough when it was a capital defendant making the challenge for cause against a venireman who held some aspect of the law upon which the defendant was entitled to rely in low regard. See, e.g., *Cuevas v. State,* supra; *Trevino v. State,* 815 S.W.2d 592, 614 (Tex. Cr.App.1991); *Teague v. State,* 864 S.W.2d 505, 513 (Tex.Cr.App.1993). Cf. *Martinez v. State,* 899 S.W.2d 655 (Tex.Cr.App.1994) (appellant's challenge for cause appropriately denied where, even though venireman opined in response to inartful questioning that he would not be able to follow court's instruction not to apply law of parties at punishment phase of trial, counsel's questions were "confusing and were not followed up by more pinpoint questioning" whether he could follow the law). That the Court should blatantly ignore this principle when the State is the proponent of the challenge for cause "does not speak well of the evenhandedness of our supposedly adversarial criminal justice system." *Smith v. State,* supra, at 872, n. 16 (Clinton, J., dissenting).

It was nowhere explained to venireman Nolan in this cause that the law assigns the burden of *production* (if not persuasion) to the defendant to adduce mitigating evidence at the punishment phase in a capital case, and that, in the absence of evidence, he therefore may not lawfully answer the § 2(e) special issue "yes." Without this explanation, it cannot be determined whether Nolan could overcome his inclination to answer the special issue affirmatively in the absence of evidence, and follow the law instead. Thus, the State has failed to satisfy its burden to

show that Nolan was challengeable for cause, and the trial court abused its discretion to grant the challenge.

Accordingly, the Court should at least reverse the judgment of the trial court and remand the cause for a new punishment hearing, under Article 44.29(c), V.A.C.C.P., if not for a whole new trial. See *Ransom v. State*, —— S.W.2d —— [1994 WL 259057] (Tex.Cr.App., No. 71,633, delivered June 15, 1994) (pending State's motion for rehearing) (Slip op. at 5 n. 5). Because the Court does not, I respectfully dissent.

OVERSTREET, Judge, dissenting.

I dissent to the majority's treatment of appellant's sixth point of error involving a punishment jury charge instruction stating that the jury could not consider the minimum time that appellant would have to serve before becoming eligible for parole.[1] Specifically, point six avers as follows:

Appellant was denied the due process/course of law in violation of the Fourteenth Amendment to the United States Constitution and Article 1, §§ 13 and 19 of the Texas Constitution, when the trial court, over objection, proffered a punishment instruction admonishing the jury that it could not consider the minimum time appellant would have to serve before becoming eligible for parole.

The majority cites our plurality opinion in *Smith v. State*, 898 S.W.2d 838 (Tex.Cr.App.

1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80, and simply adopts the reasoning therein. I dissent to that approach for disposition.

The record reflects that the trial court included the following instruction within the punishment jury charge.

During your deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice or of the Governor, or how long the defendant would be required to serve to satisfy a sentence of life imprisonment.

The record reveals that while appellant's objection/request at trial did not verbatim correspond with his above-quoted point of error, it was clearly complaining about the jury being prevented from considering that the law required appellant to serve a minimum of fifteen years incarceration if sentenced to life rather than death.

Specifically, the record reflects that when asked whether the defense had any objections to the punishment jury charge, appellant replied that he had "both an objection and a requested charge." He then requested and objected to the jury charge "as fail[ing] to contain a parole charge that, in essence, would inform the jury and instruct [the jury]

---

1. Points five and seven aver denial of due process/course of law, and cruel and unusual punishment in disallowing "testimony that appellant would never be paroled" as relevant to the issue of whether he would be a continuing threat to society. However, although appellant proffered opinion testimony that appellant would *never* be paroled, it is well-settled that the granting of parole is discretionary and not definite. *See* Article 42.18, V.A.C.C.P.

Point eight alleges denial of the right to be free from cruel and unusual punishment in refusing to submit appellant's requested instruction that he would have to serve a minimum of fifteen years before becoming eligible for parole, which had mitigating relevance to the issue of whether he would be a continuing threat to society. However, his argument under this point continues to focus upon proffered testimony that he "would never be paroled" and simply adds that

refusing his requested instruction "prevented the jury from weighing the mitigating effect of punishment testimony that [he], given his age, would not likely pose a future threat while incarcerated or thereafter." I have previously expressed my view that information about the effect of parole is not necessarily within the ambit of mitigating evidence. *See Willingham v. State*, 897 S.W.2d 351, 360–61 (Tex.Cr.App.1995), *cert. filed*, July 25, 1995. I also observe that *Simmons v. South Carolina*, —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) involved a violation of due process protections, rather than the prohibition against cruel and unusual punishments, in not informing the jury of the particular parole restrictions; in particular, the opinion of the Court specifically expressed no opinion as to whether its result was compelled by the Eighth Amendment. *Id.,* —— U.S. at ——, 114 S.Ct. at 2187, 129 L.Ed.2d at 141, n. 4.

that if [he] received life in prison, that he would not be eligible for parole under any circumstances until he had served at least fifteen calendar years in prison." He further argued that based upon the evidence in the case, it was important for him to argue and to have the charge instruct the jury in terms of parole law so that it would know that and could determine where appellant would be in the future. He added that such was critical to the jury's decision with respect to the future dangerousness and mitigation special issues. Clearly, a fair reading of the record reveals that appellant's trial objection/request complained about the jury being prevented from considering that the law required appellant to serve a minimum of fifteen years incarceration before becoming eligible for parole if sentenced to life rather than death. The trial court overruled appellant's objection/request. Thus his claim of error was preserved.

In light of *Simmons v. South Carolina*, — U.S. —, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), due process and due course of law may require, in the face of a proper request, that the jury be informed of the amount of time a defendant must serve before becoming eligible for parole when sentenced to life for capital murder. The Supreme Court observed in *Simmons* that "prosecutors in South Carolina, like those in other States that impose the death penalty, frequently emphasize a defendant's future dangerousness in their evidence and argument at the sentencing phase; they urge the jury to sentence the defendant to death so that he will not be a danger to the public if released from prison." *Simmons*, — U.S. at —, 114 S.Ct. at 2193, 129 L.Ed.2d at 142, citing

Eiseberg & Wells, "Deadly Confusion: Juror Instructions in Capital Cases," 79 Cornell L.Rev. 1, 4 (1993). Moreover,

> "[i]n assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. Holding all other factors constant, it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole."

*Simmons*, — U.S. at —, 114 S.Ct. at 2194, 129 L.Ed.2d at 142.

In the instant cause, the jury was required to answer the future dangerousness special issue which asked whether there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. Appellant presented evidence of his age, 37 at the time of trial, and expert testimony as to the decline in propensity for violence as men age and spend long periods of time in prison, and of appellant's ability to function and live peaceably in a prison environment. In my view, in the face of such evidence, and the jury having to answer the future dangerousness special issue as to whether there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society, due process and due course of law required that the jury be informed of the fact that appellant *must* serve fifteen years incarceration in prison before becoming eligible for parole if sentenced to life rather than death.[2]

Thus I disagree with and dissent to the majority's blind adoption of the reasoning in the *Smith* plurality.[3]

---

2. Under the present law, a prisoner serving a life sentence for capital murder is not eligible for release on parole until he has served *40 years*. Article 42.18, § 8(b)(2), V.A.C.C.P.

3. In light of the majority's refusal to acknowledge the due process and due course of law error, I see no need to delineate a harm analysis. However, when, or if, the majority sees the light and recognizes such error, a harm analysis will

be appropriate. *See, e.g., Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Cr.App.1984) (op. on reh'g), *but see Rose v. State*, 752 S.W.2d 529, 553–54 (Tex.Cr.App.1987) (op. on reh'g), *Arnold v. State*, 786 S.W.2d 295 (Tex.Cr.App.1990), *cert. denied*, 498 U.S. 838, 111 S.Ct. 110, 112 L.Ed.2d 80 (1990), and Tex.R.App.Pro. 81(b)(2). In the instant cause, such analysis would obviously involve consideration of the evidence of the facts of the offense and of appellant's prior convictions

MALONEY, Judge, dissenting.

Reaffirming the reasoning in my dissenting opinion in *Smith v. State*, 898 S.W.2d 838 (Tex.Crim.App.1995) (Maloney, J., dissenting), *cert. denied*, —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995), I dissent to the majority's eighth point of error.[1] In his eighth point of error, appellant argues that the trial court's refusal to instruct the jury regarding the statutory minimum incarceration period that he would be required to serve before becoming eligible for parole violated the cruel and unusual punishment provision of the Eighth Amendment applicable to the states through the Due Process Clause of the Fourteenth Amendment of the United States Constitution.[2]

Appellant contends that the trial court effectively prevented the jury from giving mitigating weight to the testimony of Wendell Dickerson, James Marquart, and Walter Quijano at the punishment stage of the trial. While this Court has held that appellant cannot be prevented from presenting this testimony to the jury, *Matson v. State*, 819 S.W.2d 839, 850–51 (Tex.Crim.App.1991), without instruction on the applicable parole eligibility law, it is my opinion that appellant's Eighth Amendment rights cannot be fully realized. *See Smith*, 898 S.W.2d at 874–86 (Maloney, J., dissenting).

Wendell Dickerson, a psychologist, testified as an expert witness on behalf of appellant. Dickerson testified that he was employed as the chief psychologist for the Department of Corrections in Huntsville, Texas. Dickerson stated that there were few disciplinary infractions in appellant's Texas Department of Corrections record,[3] and "for the most part, the sanctions imposed were lightweight." After reviewing appellant's record and background, Dickerson expressed his opinion that "the odds greatly favor [appellant] behaving himself under conditions of serious structure" such as a prison environment:

> Q: [Defense counsel] Can you explain to us in relation to these records, if you have an opinion, why you believe that [appellant's] conduct in prison seems to be significantly different than the conduct in the free world?
>
> A: [Dickerson] The implications that I would draw from the records is that in a stable, structured environment, this man understands what's—what the rules are and what's going to happen so that he's able to comport his conduct in a more acceptable fashion.

\* \* \* \* \* \*

and unadjudicated offenses/acts, counsels' jury arguments, and the remainder of the jury charge.

1. I also note that the majority's lumping together of several distinguishable points of error, five through eight, leads to the inaccurate resolution of issues and provides little guidance for the bench and bar. *Broxton v. State*, 909 S.W.2d 912, 919 (Tex.Crim.App.1995). The majority overrules appellant's fifth, sixth, seventh, and eighth points of error in two cursory paragraphs, citing to only two cases, *Smith v. State*, 898 S.W.2d 838 (Tex.Crim.App.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995) and *Jones v. State*, 843 S.W.2d 487, 495 (Tex.Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). *Broxton*, at 919. The majority's disposal of points of error five through eight fails to provide a stated, meaningful, and thorough review by this Court in this case where the State has imposed the penalty of death.

2. While his eighth point of error additionally alleges that the trial court's refusal violated article 1, section 13 of the Texas Constitution, appellant does not adequately brief this point, and we decline to make his arguments for him. *Johnson v. State*, 853 S.W.2d 527, 533 (Tex.Crim.App. 1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993); Tex.R.App.P. 74 & 210.

3. Testimony regarding the Texas Department of Corrections' records indicated that appellant's disciplinary infractions were sleeping late on several occasions; hanging something on his light in his cell; yelling; possessing a pitcher of ice, deemed "contraband" in the Department of Corrections; trying to take a pair of pants in to be pressed; throwing coffee at another inmate; wearing the wrong pair of shoes; failing to show up for a shave; failing to close his door; failing to attend class one day; and smoking in a prohibited place.

A: [Dickerson] Well, whenever he is in a situation where he is safer and knows how it works, he is less frightened. He is able to secure some measure of recognition and affirmation for himself more readily and can play the game more successfully. And so the aggressive acting out kind of conduct diminishes. Where he is in a relatively unstructured field, apparently he becomes frightened, concerned, doesn't know how to operate in a more competitive situation; and something goes wrong.

Appellant also called James Marquart, an associate professor of criminal justice at Sam Houston State University, who testified regarding a study he conducted which found that juries were incorrect eighty percent of the time when determining future dangerousness. Marquart looked at a group of inmates whose death sentences had been vacated or commuted and subsequently released into the general prison population. His research found that the vast majority of these inmates

went on to become, quote, good inmates. That is, they did not just—they did not pose a disproportionate threat to other inmates, to staff, or to property. I mean, they behaved, and they became what I would consider to be good inmates.

\* \* \* \* \* \*

Well, those people that had been predicted to be a continuing threat to society were much less a threat than ordinary inmates.

In addition, Marquart testified about the correlation between the age of the defendant and likelihood of engaging in future acts of violence:

Q: [Defense counsel] Is there a difference from what you've seen in your research and somebody being a threat in prison and being a threat out of prison?

A: [Marquart] Well, those people that are going to be threats internally are usually

those folks that have been there. In many cases, they're a lot younger. . . . There is sort of an odd correlation between the length of a prison sentence with the propensity for violence within the penal setting.

Q: [Defense counsel] Is that correlation the longer the prison sentence, the less likely there is to be violence?

A: [Marquart] That's what it looks like, yes.

Q: [Defense counsel] And that's related not just to the length of the sentence, but the age as the time progresses, correct?

A: [Marquart] Yeah. If there is one brutal fact about crime and criminality and future violence or anything like that, age—if anybody agrees on anything, it's age. Age is the one—like I said, it's the one group fact about crime. The older one is the less likely one that's [sic] going to engage in that kind of activity in the future.

Finally, the State offered the testimony of Walter Quijano, a clinical psychologist, as a rebuttal expert witness. After describing the variables used in predicting whether someone poses a continuing threat, Quijano predicted that appellant would, "more likely than not, continue to engage in violent acts against society." Quijano conceded that his opinion would be a "better predictor if [appellant] was in the streets." Quijano admitted that appellant's pattern of behavior in the Louisiana and Texas prison system, i.e., that he was involved in far fewer disciplinary violations as he got older, fit the classic scenario that one begins to conform more and more with age:

Q: [Defense counsel] It's very possible that somebody can be a threat to society on the street and not be a threat to anybody in a prison environment, correct?

A: [Quijano] That is true.

\* \* \* \* \* \*

Q: [Defense counsel] And the best indicator and probably the strongest indicator in your mind as to whether or not someone would commit crimes on the street is their prior record, their history of criminal actions, correct, particularly in this case?

A: [Quijano] Yes.

Q: [Defense counsel] And the same thing holds true with respect to that likelihood in prison, that their conduct while there, especially over a long period of time, is a pretty good indicator on what you can expect in the future, especially as they get older.

A: [Quijano] Yes.

Without an instruction indicating the minimum period of time appellant would serve before becoming eligible for parole, it is difficult to imagine how the jury could have given the above testimony any mitigating effect. The testimony of Dickerson, Marquart, and Quijano indicated that time and appellant's environment were important factors in predicting future dangerousness.

Despite our decisions defining "society" as prison society and free society,[4] during the punishment phase of the trial, the State argued to the jury that society *did not* include prison society:

Special Issue No. 2 asks you to determine whether or not there is a probability that the defendant will commit criminal acts of violence that will constitute a continuing threat to society. Nowhere, nowhere— despite what counsel for the defense says, *nowhere does it say in that Special Issue, whether or not there is a probability while incarcerated in the penitentiary that the defendant will be a continuing threat to* *society* by way of committing criminal acts of violence in the future. *We don't have to prove to you that he's going to be a threat while he's in prison.* Now that's what they [appellant's counsel] would like. you to believe that Issue says, but that's not what it says.

The State went on to discuss the definition of society, "Those people out in this courtroom are a part of society." The State then listed the victims of appellant's alleged offenses and noted that they were also a part of society.

While it effectively argued at trial that "society" does not include prison society, the State now argues, on appeal, that "society" encompasses both the penitentiary and the free world. It is likely that the jurors were uncertain about whether to consider the testimony of appellant's disciplinary infractions while in the Louisiana and Texas Department of Corrections,[5] because, after eliciting this testimony, the State argued that it was irrelevant. Jurors, uninformed as to the meaning of "society," were left to speculate.

The trial court's refusal of appellant's minimum incarceration period instruction violated appellant's rights under the Eighth and Fourteenth Amendments, particularly in light of our decision in *Matson, supra,* established Eighth Amendment death penalty jurisprudence, and the Supreme Court's decision in *Simmons v. South Carolina,* —— U.S. ——, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). Due to jurors' inability to "give effect" to relevant mitigating evidence of decreased recidivism and violence over time, the trial court unconstitutionally denied appellant's minimum incarceration period instruction. *Smith,* 898 S.W.2d at 874–86 (Maloney, J., dissenting). Because I would vacate the trial court's sentence of death and remand appel-

---

4. *E.g., Jones v. State,* 843 S.W.2d 487, 495 (Tex. Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993); *Boyd v. State,* 811 S.W.2d 105, 118 n. 12 (Tex.Crim.App. 1991), *cert. denied,* 502 U.S. 971, 112 S.Ct. 448, 116 L.Ed.2d 466 (1991).

5. Appellant was in the Louisiana Department of Corrections from age eighteen to thirty-one and the Texas Department of Corrections from age thirty-one to thirty-five. Appellant was thirty-seven at the time of trial for the instant offense. Appellant's disciplinary records from the Louisiana Department of Corrections included fighting with other inmates, refusing to work, possession of a weapon, possession of money, theft of state property, and attempted suicide. For Texas Department of Corrections disciplinary violations, see *supra* n. 3.

lant's cause for a new punishment hearing,[6] I respectfully dissent.