

# IN THE
# TENTH COURT OF APPEALS

### No. 10-08-00153-CR

**AARON EUGENE HENDERSON,**

                                               **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                               **Appellee**

### From the 40th District Court
### Ellis County, Texas
### Trial Court No. 32146CR

## MEMORANDUM OPINION

Aaron Eugene Henderson was found guilty by a jury of intoxication manslaughter. TEX. PEN. CODE ANN. § 49.08 (Vernon Supp. 2008). This was enhanced to a first-degree felony due to Henderson's previous convictions. TEX. PEN. CODE ANN. § 12.42 (Vernon Supp. 2008). The jury assessed punishment at confinement for life in the Texas Department of Criminal Justice – Institutional Division. Henderson complains that the results of a blood test taken from him were taken in violation of Texas Transportation Code Section 724.012, the Fourth Amendment to the United States Constitution, and Article I, Section 9 of the Texas Constitution. Henderson also

complains that the evidence was legally and factually insufficient to support the conviction for intoxication manslaughter. Because we find no violation of the Transportation Code, the United States Constitution, or the Texas Constitution, and we find the evidence is both legally and factually sufficient to support the conviction, we affirm the judgment of the trial court.

*Factual Background*

We will provide a description of the testimony of the relevant witnesses because a discussion of the evidence is helpful to understand our determination of each of the issues. Likewise, we will describe the objections to that testimony, which are relevant to the issues raised in this appeal.

On February 25, 2007, Henderson, driving a black Isuzu SUV, was involved in a traffic collision while traveling southbound in Ellis County, Texas. This collision caused the death of Mimi Beth Wittlinger, the driver of the other vehicle traveling northbound, which was a white Infiniti. Henderson was taken by helicopter to a hospital in Dallas.

Officer Joel Downs was the first law enforcement officer to arrive on the scene at approximately 10:42 p.m. He identified Henderson's legs as being pinned under the dash of the driver's seat of the Isuzu. An opened twelve-pack of beer bottles and a flask were located in the back seat passenger floorboard with broken bottles scattered on the floor. Some were missing. When Officer Downs spoke with Henderson at the scene, he smelled a strong odor of alcohol on and around Henderson's person. When he went to check on Wittlinger, she was still alive, but stopped breathing while he was checking

her vital signs. Wittlinger died at the scene from her injuries. Downs believed that alcohol had played a role in the collision.

Fred Johnson was the first person on the scene after the collision. He identified Henderson as the person in the driver's seat of the Isuzu upon his arrival. He did not smell alcohol when he spoke with Henderson at the scene.

Robin Roberts, a registered nurse, was on the helicopter flight to the hospital with Henderson. She testified that she smelled alcohol on Henderson. Henderson was calm at the scene but became very combative during the flight, attempted to knock out the helicopter window, and was swearing profusely.

Angela Lewis was a treating nurse in the emergency room at the hospital who testified concerning Henderson. Upon Henderson's arrival at the hospital, he had to be restrained with handcuffs by hospital security officers due to his aggression, which included attempts to remove his IV. Henderson was speaking incoherently and slurring his speech. He had a diabetic bracelet on his wrist. She was unable to obtain a medical history from him. She smelled alcohol on his breath and clothing. Henderson denied that he had been drinking. The medical records admitted into evidence from the hospital also describe Henderson as being intoxicated.

Sergeant Marc Schroeder was an investigating officer at the scene and determined that alcohol was likely a factor in the accident. Downs reported his findings to him upon his arrival. Schroeder smelled a strong odor of alcohol from inside the Isuzu. Schroeder left the scene to go to the hospital where Henderson was being treated to have Henderson's blood drawn for purposes of having it tested to determine

Henderson's blood alcohol level. Schroeder knew at that time that Wittlinger had passed away.

Upon his arrival at the hospital, Schroeder informed Henderson that he was investigating intoxication manslaughter and asked for a specimen of blood. Henderson ignored Schroeder. Schroeder instructed Lewis to take blood from Henderson, which she did through the femoral artery. This was because previous attempts to draw blood elsewhere were unsuccessful. Henderson was still during the blood draw. At no time did Schroeder consider Henderson to be under arrest. The sample was taken at approximately 12:30 a.m., roughly two hours after the collision.

Schroeder did not attempt to get a warrant for the drawing of the blood of Henderson. It would have taken approximately two to three hours to get the warrant, which would have resulted in Henderson's blood alcohol level being metabolized in his system and significantly reduced. He did not know if Henderson was intoxicated at the time of the blood draw or if intoxication had caused the collision because the investigation was still open.

Andrew Macey, DPS chemist, tested the sample of Henderson's blood with a gas chromatograph and determined that Henderson's blood alcohol level was .23 grams per 100 milliliters of blood, which is almost three times above the legal limit of .08 grams per 100 milliliters of blood.

Sergeant Jim Langham investigated the cause of the collision. After speaking with Downs, he studied the scene of the collision. Based on the severity and location of the damage to each vehicle, the gouges in the road, and the debris, he determined that

the collision was caused by Henderson's Isuzu crossing the yellow centerline and hitting the Infiniti driven by Wittlinger. In his investigation, he had also attempted to reconstruct the collision in a manner that would indicate that Wittlinger had caused the collision, but could not make it fit in that manner. He observed, but did not test, a visible line of fluid on the road leading to Wittlinger's Infiniti nor did he check the Infiniti for leaks because, in his opinion, it did not fit with the damage.

John Murray, a defense accident reconstruction expert, reviewed the photos, video of the scene, and the diagram prepared by Langham, as well as viewing the scene more than a year after the collision. When he went to the scene, the road had since been resurfaced which left no trace of the collision. In Murray's opinion, the accident was caused by Wittlinger crossing the line and hitting Henderson. He believed that the fluid line indicated a mechanical failure in Wittlinger's vehicle which could have caused the collision. Based on his extensive experience in accident investigations, Murray believed that the vehicle should have been checked for mechanical failure and the fluid tested to determine its source prior to determining the cause of the collision. The Infiniti was unavailable for his inspection because it had been destroyed. Murray thought the investigation by Langham was not done properly and that the schematic drawing Langham prepared of the scene was fatally flawed as it was in a straight line whereas the collision took place on a curve in the road. Murray further disagreed with Langham's characterization of marks and gouges in the road.

Henderson elected to testify on his own behalf. Henderson admitted he had two prior felony convictions. The first was in 1982 for burglary of a habitation, burglary of a

building, and theft. The second was in 1985 for burglary of a habitation. He served time in prison for both offenses.

Henderson did not recall driving the vehicle or the collision. He did not remember the helicopter flight or being pulled from the Isuzu, which belonged to a female friend of his. Henderson did, however, know he was not driving the vehicle. Two friends of Henderson, Dwight Webb and Reginald Sharp, had purchased the beer found in the back seat, but Henderson had not consumed any of it. At one point in his testimony, Henderson admitted he had consumed a few beers at Tony Webb's house. Tony is Dwight's brother. Reginald was driving and Dwight was in the passenger seat in the Isuzu with Henderson. Henderson was in the back seat lying down because he was tired from taking medication for a sinus infection. Henderson believed that his friends ran away after the collision, but that Reginald was the driver of the Isuzu when it collided with Wittlinger.

Henderson did not wake up until he was in the hospital. He did not remember being combative or using foul language at the hospital or in the helicopter. He did not speak with a police officer at the hospital but did recall being restrained. He did not recall having his blood drawn, and he did not consent because he was not asked to provide a sample. He was released from the hospital the next morning, February 26, 2007. Henderson found out there would be a warrant issued for him on March 1, 2007, but was not arrested until May 30, 2007.

Henderson agreed that he did have alcohol in his system when his blood was drawn. He had started drinking beer that day at approximately 5:00 p.m., but in later

testimony he denied drinking alcohol at Tony's house, contrary to what he had testified to earlier. He drank approximately four beers between 5:00 and 5:45 p.m., but had nothing else. Henderson concluded that he might have been legally intoxicated when he was in the Isuzu, but it did not affect his physical abilities.

Henderson also testified that Reginald was driving Henderson to Henderson's home in Dallas when they left Tony's house. Henderson did not believe he had been pinned or removed from the front seat of the car, although he had no recollection of it. Henderson had been using the Isuzu for about two months and kept all of his tools in it.

Henderson is not diabetic and had never worn a diabetic bracelet, although the nurses had identified him as having one on him when he arrived at the hospital. He did not believe that his blood had been taken at the hospital, but that maybe it was someone else's blood.

Henderson first complains in points of error one, two, and three that his blood was taken in violation of Texas Transportation Code Section 724.012, the Fourth Amendment to the United States Constitution, and Article I, Section 9 of the Texas Constitution. We will address these contentions together.

### Standard of Review for the Admission of Evidence

We review the admission of evidence by applying an abuse of discretion standard of review. We will reverse the trial court's decision only if it is outside the zone of reasonable disagreement. *Allen v. State*, 108 S.W.3d 281, 284 (Tex. Crim. App. 2003). An appellate court must affirm the trial court's decision to admit evidence if the trial court's ruling is correct under any theory of law, even if the trial court gives the

wrong reason for the ruling. *See Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

*Blood Testing*

Section 724.012 of the Texas Transportation Code provides in relevant part that:

(a) One or more specimens of a person's breath or blood may be taken *if the person is arrested* and at the request of a peace officer having reasonable grounds to believe the person:

(1) while intoxicated was operating a motor vehicle in a public place, or a watercraft; . . . .

(b) a peace officer shall require the taking of a specimen of the person's breath or blood if:

(1) the officer *arrests* the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft;

(2) the person was the operator of a motor vehicle or a watercraft involved in an accident that the officer reasonably believes occurred as a result of the offense;

(3) *at the time of the arrest* the officer reasonably believes that as a direct result of the accident: (A) any individual has died or will die; or (B) an individual other than the person has suffered serious bodily injury; and

(4) the person refuses the officer's request to submit to the taking of a specimen voluntarily.

TEX. TRANSP. CODE ANN. § 724.012 (Vernon Supp. 2004) (emphasis added).

Chapter 724 of the Transportation Code enlarges what is constitutionally required with regard to taking blood samples when a person is under arrest for an intoxication-related offense; however, it does not apply to persons who are not under arrest when the blood sample is taken. *State v. Laird*, 38 S.W.3d 707, 713 (Tex. App.—Austin 2000, pet. ref'd).

The taking of a blood specimen is a search and seizure under both the Fourth Amendment of the United States Constitution and Article I, Section 9 of the Texas Constitution. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. *See Schmerber v. California*, 384 U.S. 757, 767-68, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966); *See also Aliff v. State*, 627 S.W.2d 166, 170 (Tex. Crim. App. 1982). However, the warrantless taking of a blood sample is not an unreasonable search and seizure so long as probable cause to arrest exists, the method of extraction is reasonable, and there are exigent circumstances. *Schmerber*, 384 U.S. at 767-68; *Aliff*, 627 S.W.2d at 170.

Texas courts apply the probable cause and exigent circumstances test in cases where a blood sample is taken from someone not under arrest. *Laird*, 38 S.W.3d at 713 (citing *Pesina v. State*, 676 S.W.2d 122, 123, 125 (Tex. Crim. App. 1984); *Weaver v. State*, 721 S.W.2d 495, 497 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd); *Burkhalter v. State*, 642 S.W.2d 231, 232-33 (Tex. App.—Houston [14th Dist.] 1982, no pet.)).

*Preservation of Error*

It is necessary to preserve a complaint for appeal that the objection made at the trial court comports with the complaint made on appeal. *See Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (point of error must correspond to objection made at trial, and objection stating one legal theory may not be used to support a different legal theory on appeal). A constitutional ground may be waived by a failure to object at trial, including the admission of evidence from an illegal search.). *Boulware v. State*, 542 S.W.2d 677, 682 (Tex. Crim. App. 1976); *Ashford v. State*, 502 S.W.2d 27, 29 (Tex. Crim. App. 1973).

It is also generally true that an error in the examination of witnesses or the admission of evidence is not preserved for appellate review absent a timely and specific objection at trial. An objection must not only identify what is objected to, but must also set forth specific grounds for the ruling desired. TEX. R. APP. PROC. 33.1(a); *Cisneros v. State*, 692 S.W.2d 78, 82-83 (Tex. Crim. App. 1985).

The purposes of a trial objection are to inform the trial court of the basis of the objection which affords the trial court the opportunity to rule on it, and secondly, to give opposing counsel an opportunity to remove the objection or supply other testimony. *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977). No objection was lodged at any time regarding the illegality of the search based on either federal or state constitutional grounds. Henderson's objections solely surrounded the failure of law enforcement to abide by Texas Transportation Code 724.012, which does not apply in this case as Henderson was not under arrest. For this reason, Henderson's complaint has not been preserved for our review. *See Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990).

Further, even if the complaint had been preserved, Texas law requires a party to continue objecting each time that allegedly inadmissible evidence is offered. *See Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). Any error in admitting the evidence is cured where the same evidence comes in elsewhere without objection. *See Etheridge v. State*, 903 S.W.2d 1, 14 (Tex. Crim. App. 1994); *Rogers v. State*, 853 S.W.2d 29, 35 (Tex. Crim. App. 1993). There was no objection made to the oral testimony by DPS Chemist Macey as to the blood alcohol content being .23 grams. While there were

objections lodged to other testimony, the written exhibit, and the State's opening statement, these objections were waived when the evidence came in through Macey's testimony. We overrule points of error one, two, and three.

*Points of error four and five*

Henderson's points of error four and five are that the evidence is legally and factually insufficient to support his conviction for intoxication manslaughter.

*Legal Sufficiency*

In assessing the legal sufficiency of the evidence to support a conviction, an appellate court must consider all the record evidence in the light most favorable to the prosecution and determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the defendant guilty of all the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); *Lane v. State*, 151 S.W.3d 188, 191-92 (Tex. Crim. App. 2004).

A review of the evidence for legal sufficiency does not involve a reweighing of the evidence or a substitution of the jury's judgment. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The jury is the exclusive judge of witness credibility, the determiner of the weight accorded to witness testimony, and the reconciler of conflicts in the evidence. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). In addition, when reviewing the evidence for legal sufficiency, the evidence is not weighted as favorable and nonfavorable, nor is the appellant's version of the facts adopted. *See Margraves v. State*, 34 S.W.3d 912, 917 (Tex. Crim. App. 2000). Further, all

evidence, whether properly or improperly admitted, will be considered when reviewing the evidence for legal sufficiency. *See Lockhart v. Nelson*, 488 U.S. 33, 41-42, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988); *Johnson v. State*, 967 S.W.2d 410, 411 (Tex. Crim. App. 1998).

Viewed in a light most favorable to the prosecution, the testimony demonstrated that Henderson was pinned in the Isuzu in the driver's seat at the scene of the collision. Both law enforcement and medical personnel smelled alcohol on Henderson's person and breath. Henderson's behavior was consistent with a person intoxicated on drugs or alcohol. His blood alcohol content was .23 milliliters per 100 milliliters of blood approximately two hours after the collision. The expert for the State believed that Henderson had caused the collision by crossing the yellow center stripes. Mimi Beth Wittlinger died as a result of injuries sustained in the collision. Henderson was traveling southbound to get to his home to the north. The evidence was legally sufficient to support the jury's finding that Henderson was guilty of intoxication manslaughter. We overrule point of error number four.

*Factual Sufficiency*

In a factual sufficiency review, the appellate court views the evidence in a neutral light and asks whether the evidence supporting the verdict is so weak or so against the great weight and preponderance of the evidence as to render the verdict manifestly unjust. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008). Although a factual sufficiency review authorizes an appellate court, to a very limited degree, to act as a "thirteenth juror," the

appellate court must nevertheless give the jury's verdict a great degree of deference. *Watson v. State*, 204 S.W.3d 404, 416-17 (Tex. Crim. App. 2006). A "high level of skepticism about the jury's verdict" is required before an appellate court may reverse due to factual insufficiency." *Watson*, 204 S.W.3d at 417. An appellate court may not find the evidence to be factually insufficient merely because there are "reasonably equal competing theories of causation." *Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001). And a factual sufficiency reversal certainly may not occur when the evidence actually preponderates in favor of conviction. *Watson*, 204 S.W.3d at 417. Before reversing a conviction on the basis of factual insufficiency, an appellate court must detail all the relevant evidence and must explain in exactly what manner the evidence is factually insufficient. *Watson*, 204 S.W.3d at 414.

As the exclusive judge of the facts, the jury could believe or disbelieve all or any part of Henderson's testimony regarding whether he was the driver of the vehicle or not. *Evans v. State*, 202 S.W.3d 158 (Tex. Crim. App. 2006); *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981). Further, the jury, after hearing all of the testimony and reviewing the exhibits, certainly could have believed Langham's version of how the collision took place or disbelieved Murray's account that the collision was the fault of Wittlinger. Viewing the evidence in a neutral light, we also cannot say that the evidence supporting the verdict is so weak or so against the great weight and preponderance of the evidence as to render the verdict manifestly unjust. We find the evidence is factually sufficient to support the jury's verdict. We overrule point of error number five.

*Conclusion*

We find that the trial court did not abuse its discretion in the admission of the blood alcohol content of Henderson.  We further find that the evidence is legally and factually sufficient to support the conviction of Henderson for intoxication manslaughter.  We therefore affirm the judgment of the trial court.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
        Justice Reyna, and
        Justice Davis
Affirmed
Opinion delivered and filed July 22, 2009
Do not publish
[CRPM]