COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

ANTONIA MIRAMONTES,                               )

                                                                              )              
No.  08-03-00441-CR

Appellant,                          )

                                                                              )                   Appeal from the

v.                                                                           )

                                                                              )               
168th District Court

THE STATE OF TEXAS,                                     )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )              
(TC# 20030D03912)

                                                                              )

 

 

O P I N I O N

 

This is an appeal
from a conviction for the offense of unlawful possession of certain chemicals
with the intent to manufacture a controlled substance, methamphetamine.  After a jury trial, Appellant was sentenced
to 10 years=
confinement in the Institutional Division of Texas Department of Criminal
Justice.  On appeal, Appellant raises
five issues.  In Issues One and Two, she challenges
the legal and factual sufficiency of the evidence.  In Issue Three, she challenges the admission
of extraneous offenses without proper notice. 
In Issue Four, she contends that this extraneous evidence was more
prejudicial than probative, thus denying her a right to a fair trial.  In Issue Five, she complains of a jury charge
error.  We affirm. 








Appellant=s trial began on September 9,
2003.  At trial, the State=s first witness was El Paso Police
Department Detective Jose Candelaria. 
The State established that he had extensive training in narcotics,
including attending a clandestine laboratory school, classified interdiction
classes, and observing indoor marijuana groves. 
As part of his training, the detective learned how to make
methamphetamine.  He provided extensive
explanation on the chemicals necessary to make methamphetamine and indicated
that through his training, he is able to recognize the smell of a
methamphetamine lab which he described as a very chemical like, pungent
odor.  He also testified that he had been
to fifteen methamphetamine labs or suspected labs in El Paso.  In all these places, he noticed the signature
smell of a methamphetamine lab.

On August 16,
2002, he was part of a team that executed a no-knock search warrant on the
residence located at 804 Lomita in El Paso County.  He testified that there were about twelve to
fifteen agents present, including members of the United States Drug Enforcement
Agency (DEA).  Detective Candelaria
testified that the DEA agents entered the house first, and by the time he entered
the house, the subjects inside the house, Appellant, Antonio Banda, and Myra
Gonzalez, had already been handcuffed and secured by the DEA agents.  He then proceeded to tour the house,
searching for any type of narcotic evidence, or evidence that would indicate
the presence of a methamphetamine lab. 
He was looking for chemicals like red phosphorus, iodine, and any kind
of denatured alcohol with Drano, Red Devil, Sudafed tablets or blister packs,
glassware, and finished products.

In the kitchen, he
observed yellowish, almost orange stains which he believed were iodine
stains.  He also discovered a coffee
filter with a reddish powder in it, which he believed was red phosphorus.  A generator was also found in the kitchen
trash, as well as a gram scales and denatured alcohol.  In the living room, he found a tincture of
iodine.








In Ms. Gonzalez=s room, a pipe and two small baggies
that appeared to contain methamphetamine, and some unknown liquids were
found.  Additionally, a powder found in
Myra=s bedroom
turned out not to be methamphetamine.  In
another bedroom, a Coleman fuel tank was found. 
In bedroom three, iodine crystals, two other unknown liquids, coffee
filters, a heating element, two bags and a pipe, a burner, tubbing, and a
funnel were found.  Red Devil lye was
found in the bathroom.  He also found a
bucket of discarded match books, which appeared to have the striker plates
missing from them, which he testified in his experience the striker plates are
used to extract the red phosphorus.  He
also found a water bill addressed to the Appellant and to the address of the
residence.

During
cross-examination, Detective Candelaria testified that no evidence was found in
the Appellant=s
bedroom.  He further testified that
Appellant was cooperative with them and did not try to run.  He testified that Red Devil lye is used to
unclog drains and agreed with defense counsel that a lot of people own this
product.  He continued to provide
testimony regarding the list of the State=s
exhibits and stated that these things were common household items that could be
bought at a store and none of which were illegal to own.  On re-direct examination, Detective
Candelaria indicated that he noticed a chemical smell, a pungent smell once he
was inside the house.  On re-cross
examination, Detective Candelaria testified that he did not include this in his
report, although he agreed with defense counsel that this would be important
information to place in the report.








Next to testify
was Phillip Austin Land, who at the time the search occurred was a special
agent with the DEA.  Special Agent Land
testified that he had been sent to clandestine laboratory school.  He also testified that he was sent to a
training in Quantico, VA where he received training as to the precursors and
chemicals necessary to make methamphetamine. 
Special Agent Land has also received information regarding the
life-style and the process used to make methamphetamine from talking to
narcotics violators.  He indicated that
these individuals usually stay awake all hours of the day and night and that
they are usually of a lesser weight than normal, their eyes are red and bloodshot,
and their fingertips have a gray or yellowish stain that is difficult to
remove.

Special Agent Land
testified that on August 16, 2002, when he assisted in the execution of the
search warrant on the residence at 804 Lomita, the Appellant was found getting
out of bed; she was addressed immediately and was then placed on the ground and
handcuffed.  He testified two other
individuals were arrested in the kitchen area. 
He indicated that the male subject appeared to be trying to get rid of
stuff in the kitchen sink.  By the
kitchen sink, he observed a red substance, which based on his experience and
training, he believed to be red phosphorous. 
There were also stains all over the kitchen wall.  There was another substance which he
believed, based on his experience and training, was iodine.  He also testified that he noticed a distinct
smell in the house, which he recognized as a smell similar to that found in
other methamphetamine or clandestine labs. 
Special Agent Land also omitted this information from his report and
agreed with counsel that this would be important information to include in the
report.  Special Agent Land also
testified that there was nothing in Appellant=s
bedroom indicative of the manufacture of methamphetamine.








John Janczak, a
criminalist with the Texas Department of Public Safety crime lab in
El Paso also testified.  He
testified that he is a drug analyst and holds a bachelor of science degree in
chemistry.  On August 16, 2002, he was
called out to 804 Lomita.  He testified that
he was there to test for methamphetamine, but did not test for red phosphorous
or iodine because he did not have the capabilities in the lab to exclusively
identify those chemicals.  He also
testified that this evidence would not be gathered because he did not have a
license that would allow him to transport hazardous material to the lab to be
tested.  Mr. Janczak testified that
iodine can be in a liquid form or a crystallized form.  He indicated that the most available liquid
iodine is in a tincture of iodine, which he believed is found in veterinary
supply store or agricultural supply stores. 
He testified that exhibit seven was a liquid form of iodine.  He also testified as to the chemicals
necessary to make methamphetamine.  He
testified that you need among other chemicals, iodine and red phosphorous,
which can be extracted from a matchbook=s
striking pad.  He testified that coffee
filters are used to remove the red phosphorous sludge from the methamphetamine
product.  He indicated that usually Red
Devil lye is used to elevate the Ph level of the liquid to a fairly high basic
level.  He testified that he had never
come across another substance that looks like red phosphorous.  He also testified that the following State=s exhibits were found to contain
methamphetamine:  Exhibits 31, 33, 34,
37, and 39.  

Next to testify
was Detective Thomas White, of the El Paso Police Department.  Detective White indicated that he had
received training in clandestine labs and had also attended the DEA academy
methamphetamine lab training.  He
testified that the following objects were found at 804 Lomita Drive: a blister
pad of Sudafed tablets, a matchbook striker plates used to obtain the red phosphorous,
hydrogen peroxide, acetone, and citric acid.








DEA Special Agent
Randy Falkner testified next.  He
indicated that he had been though the clandestine laboratory training.  In his experience, he had encountered ten to
twelve labs and had been part of dismantling these labs.  As part of his training, he learned how to
make methamphetamine, including a method called the red phosphorus method.  He indicated that red phosphorous looks like
fine, granulated powder that is a brownish-red color.  He testified that you have to order red
phosphorous or get it off the striker plates of matchbooks; to his knowledge,
there was not a place in El Paso that sold red phosphorous.  Special Agent Falkner testified he had been
to 804 Lomita on May 6, 2002.  State=s Exhibit 26 was a drawing of the house
that Special Agent Falkner prepared when he first visited the house.  He indicated that bedroom four looked like a
teenager=s bedroom
and had a poster on the wall that read AGot
Meth?@  In the home, he found empty cans of alcohol,
denatured alcohol, and Red Devil lye.  He
testified that the Appellant had indicated that she had Red Devil lye because
she was having problems with her bathtub. 
It was explained to the Appellant that these items were used to make
methamphetamine and Appellant allowed him to destroy such items.

On August 16,
Special Agent Falkner testified that the Appellant was polite and was taken
into custody without incident.  Inside
Appellant=s home,
he testified that they found iodine and red phosphorous.  He testified that iodine is either in a
tincture or in crystal form and that if it is in a crystal form, it looks
grayish or silver.  He testified that he
did not test anything for red phosphorous or iodine because he did not have
test kit for these chemicals.  He did
however field test some powder that came back positive for
methamphetamine.  








Last to testify
was FBI Special Agent Liliana McDowell Saenz. 
Agent Saenz testified that she investigates drug crimes and often works
with other agencies, including the El Paso Police Department, the El Paso
Sheriff=s Office,
and the DEA.  She testified that she
received special training at the FBI academy, but could not recall if any of
that training involved methamphetamine. 
She was however familiar with methamphetamine because for the past year
and half from the date of the trial, she had worked for the DEA task force and
had been involved in several methamphetamine lab raids and investigations.

She testified that
prior to August 16, 2002, she had visited 804 Lomita on May 6, 2002. On May 6,
she and her partner, Special Agent Falkner were investigating different
methamphetamine cases and people involved in methamphetamine drug trafficking,
when they were called to help serve a federal search warrant on an individual
by the name of Jennifer Perez believed to be at 804 Lomita.  Inside the house, they found small quantities
of methamphetamine, as well as items used to manufacture methamphetamine.  Appellant was explained how these items are
used to manufacture methamphetamine and was warned of the dangerous nature of
the chemicals, including that a combination of them could cause an
explosion.  Appellant agreed that the
chemicals should be destroyed.  Special
Agent Saenz testified that on August 16, she saw the Appellant with stains on
her fingertips similar to those she had seen in other clandestine labs, which
was an indication based on her experience, that the Appellant had been handling
iodine.  On cross-examination, she indicated
that she had not put this information in her report.

At the conclusion
of the presentation of the evidence, the jury found the Appellant guilty and
sentenced her to ten years=
confinement.  Appellant timely filed this
notice of appeal.








In Issues One and
Two, Appellant contends the evidence is not legally and factually sufficient to
sustain a conviction for the offense of unlawful possession of certain
chemicals with intent to manufacture methamphetamine.  The State asserts in its brief that Appellant
failed to preserve her factual sufficiency claim because she does no more than
state the standard of review for a factual sufficiency review and fails to
present anything for review.  Further,
the State contends that because the Appellant is seeking an acquittal, rather
than a new trial, that this Court should construe her complaint as solely a
legal sufficiency point.  The State cites
to Villalobos v. State, 951 S.W.2d 232, 234 (Tex.App.--El Paso 1997, no
pet.), to support this contention.  We therefore
begin by addressing whether Appellant has properly preserved her factual
sufficiency point.

In Villalobos,
this Court stated, 

In his first point of error, Appellant
argues that there is no evidence that Sam Massey owned any of the stolen
property.  Because [Appellant] only seeks
acquittal rather than a new trial, we construe his complaint as one of legal
sufficiency rather than factual sufficiency.

 

Villalobos, 951 S.W.2d at
234.  While it is true that Appellant=s prayer request for an acquittal, it
also in the alternative requests for a new trial.  Unlike in Villalobos, in this case,
Appellant provides both a legal and factual sufficiency of the evidence
standard of review and argues that the evidence is insufficient on both
grounds.  In the interest of justice to
the Appellant, we will consider both the legal and factual sufficiency of the
evidence.  

Standards
of Review








In reviewing the
legal sufficiency of the evidence, we must view the evidence in the light most
favorable to the verdict to determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
318-19, 99 S.Ct. 2781, 2788‑89, 61 L.Ed.2d 560 (1979); Hernandez v.
State, 946 S.W.2d 108, 110‑11 (Tex.App.‑-El Paso 1997, no
pet.).  Sufficiency of the evidence
should be measured by the elements of the offense as defined by the hypothetically
correct jury charge for the case.  Malik
v. State, 953 S.W.2d 234, 239‑40 (Tex.Crim.App. 1997).  We do not resolve any conflict of fact, weigh
any evidence, or evaluate the credibility of any witnesses, as this was the
function of the trier of fact.  See
Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v.
State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991); Lucero v. State,
915 S.W.2d 612, 614 (Tex.App.‑-El Paso 1996, pet. ref=d). 
Instead, our duty is to determine whether if both the explicit and
implicit findings of the trier of fact are rational by viewing all the evidence
admitted at trial in the light most favorable to the verdict.  See Adelman, 828 S.W.2d at 421‑22;
Lucero, 915 S.W.2d at 614.  In so
doing, any inconsistencies in the evidence are resolved in favor of the
verdict.  Matson, 819 S.W.2d at
843; Lucero, 915 S.W.2d at 614.

In reviewing the
factual sufficiency of the evidence, we must determine whether considering all
the evidence in a neutral light, the jury was rationally justified in finding
guilt beyond a reasonable doubt.  Zuniga
v. State, 144 S.W.3d 477, 484 (Tex.Crim.App. 2004); see also Clewis v.
State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996).  There are two ways in which we may find the
evidence to be factually insufficient.  Zuniga,
144 S.W.3d at 484.  Evidence is factually
insufficient when the evidence supporting the verdict, considered alone, is too
weak to support the finding of guilt beyond a reasonable doubt.  Id.  Evidence is also insufficient when contrary
evidence is so strong that guilt cannot be proven beyond a reasonable
doubt.  See id. at 485.  However, in our factual sufficiency review,
we must give appropriate deference to the jury and should not intrude upon its
role as the sole judge of the weight and credibility given to evidence
presented at trial.  See Johnson v.
State, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); Clewis, 922 S.W.2d at
133.  Accordingly, we are authorized to
set aside the jury=s finding
of facts only in instances where it is manifestly unjust, shocks the
conscience, or clearly demonstrates bias. 
Clewis, 922 S.W.2d at 135.








Appellant was
indicted for the possession of the immediate precursors, iodine and red
phosphorous, with the intent to unlawfully manufacture a controlled substance,
methamphetamine.  On appeal, Appellant
specifically argues that the State failed to produce evidence of:  (1) Appellant=s
possession of the chemicals red phosphorous and iodine; (2) that iodine and red
phosphorous are immediate precursors; and (3) that the chemicals found were in
fact iodine and red phosphorous.  We
begin with Appellant=s
assertion that the evidence was legally and factually insufficient to prove
that iodine and red phosphorous are immediate precursors.

Appellant asserts
that the evidence was legally and factually insufficient because the State
failed to produce evidence that red phosphorous and iodine are immediate
precursors under the Texas Health and Safety Code '
481.124.  See Tex.Health & Safety Code Ann. ' 481.124 (Vernon Supp. 2004-05).  Under Texas Health and Safety Code ' 481.124(a)(2):

(a)        A person commits an offense if, with
intent to unlawfully manufacture a controlled substance, the person possesses
or transports:

 

                                                              .               .               .

 

(2)        an immediate precursor . . . .

 

See Tex.Health & Safety Code Ann. '
481.124(a)(2).  The immediate precursors
in this case were iodine and red phosphorous. 
Appellant alleges that since the indictment included these two
chemicals, the State had to prove that these are immediate precursors.

Under Section
481.002(22), immediate precursor is defined as follows:

(22)      [A] substance the director finds to be and
by rule designates as being:

 

(A)       a principal compound commonly used or
produced primarily for use in the manufacture of a controlled substance;

 

(B)       a substance that is an immediate chemical
intermediary used of likely to be used in the manufacture of a controlled
substance; and








(C)       a substance the control of which is
necessary to prevent, curtail, or limit the manufacture of a controlled
substance.

 

See Tex.Health & Safety Code Ann. '
481.002(22).  The State requests for this
Court to take judicial notice of the Texas Register listing for immediate
precursors.  The Texas Register contains
an order signed by Dr. Eduardo J. Sanchez on August 12, 2002, which lists
immediate precursors.  See 27 Tex.Reg. 8327-28 (2002).  The lists includes iodine and red
phosphorous.  Id.

It is unclear from
the record whether the trial court took judicial notice of the list, but there
is evidence of the trial court=s
knowledge of the list in the discussions between the attorneys and the trial
court regarding the Appellant=s
motion for an instructed verdict. 
However, on appeal, we have the power to take judicial notice for the
first time.  See Langdale v. Villamil,
813 S.W.2d 187, 189-90 (Tex.App.--Houston [14th Dist.] 1991, no writ).  Therefore, we judicially note that red
phosphorous and iodine are immediate precursors as prescribed by the Texas
Commissioner of Health.  








When an accused is
charged with unlawful possession of a control substance, the State must prove
that the defendant exercised actual care, custody, control, or management over
the contraband and that he knew the substance in his possession was a
controlled substance.  Brown v. State,
911 S.W.2d 744, 747 (Tex.Crim.App. 1995); see also Menchaca v. State,
901 S.W.2d 640, 651 (Tex.App.--El Paso 1995, pet. ref=d).  When the controlled substance is not found in
the accused=s
exclusive possession, additional independent facts must affirmatively link the
accused to the controlled substance.  See
Taylor v. State, 106 S.W.3d 827, 830-31 (Tex.App.--Dallas 2003, no
pet.).  The Aaffirmative
links@ analysis
is used by courts to review evidence relating to the accused=s knowledge and control of the
controlled substance.  See McQuarters
v. State, 58 S.W.3d 250, 259 (Tex.App.--Fort Worth 2001, pet. ref=d). 
Possession may be proved by circumstantial evidence.  See Wootton v. State, 132 S.W.3d 80,
87 (Tex.App.--Houston [14th Dist.] 2004, pet. ref=d).  The evidence, however, must demonstrate that
the accused=s
connection to the controlled substance was more than just fortuitous.  See id.  Factors typically used when determining
whether the evidence is sufficient to affirmatively link an accused to a
controlled substance include:  (1)
whether the contraband was found in proximity to and accessible to the
defendant; (2) whether the defendant was present when the drugs were found; (3)
whether the defendant possessed other contraband or drug paraphernalia; (4)
whether there was an odor of the contraband; (5) whether the defendant owner or
had the right to possess the place where the drugs were found; (6) whether the
place where the drugs were found was enclosed; (7) whether the accused was the
driver of the automobile in which the contraband was found; (8) whether the
defendant was found with a large amount of cash; (9) whether the defendant was
under the influence of narcotics when arrested; (10) the amount of drugs found;
and (11) whether the defendant possessed weapons.  Taylor, 106 S.W.3d at 831; McQuarters,
58 S.W.3d at 259; see also Hudson v. State, 128 S.W.3d 367, 374
(Tex.App.--Texarkana 2004, no pet.).  The
number of relevant factors is less significant than the logical force to which
they establish a link between the accused and the controlled substance.  See Taylor, 106 S.W.3d at 831; Hudson,
128 S.W.3d at 374.  Further, the links
need not be so strong as to rule out every other possibility except the
defendant=s
guilt.  Brown v. State, 911 S.W.2d
744, 748 (Tex.Crim.App. 1995); Wootton, 132 S.W.3d at 87.  Accordingly, affirmative links are established
by the totality of the circumstances.  See
Wootton, 132 S.W.3d at 87.








In this case, when
the search warrant was executed, inside the house was the Appellant, whom
officers found getting out of bed in bedroom one, and two other individuals
identified as Antonio Banda and Myra Gonzalez. 
A water bill addressed to the Appellant at the 804 Lomita address and
for that residence was found inside the house. 
Detective Candelaria testified that he observed stains in the kitchen
sink which based on his experience and training, were consistent with iodine
stains.  There were also coffee filters
with a reddish powder in them, which Detective Candelaria testified he believed
was red phosphorous.  In his experience,
he had seen coffee filters used to filter red phosphorous.  Additional items found in the house were a
generator, often used in the manufacturing of methamphetamine, a tincture of
iodine was found in the living room inside a credenza, and a gram scale.  In bedroom three, which was believed to be
Ms. Gonzalez=s room,
they found some unknown liquid and pipes, two small bags that were thought to
contain methamphetamine, a Coleman fuel tank, a heating element, a burner,
tubing, and funnel.  They also found a bucket
with discarded matchbooks that appeared to have the striker plates
missing.  Detective Candelaria testified
that the striker plates contain red phosphorous and in his experience are used
to extract the red phosphorous in the manufacturing process of
methamphetamine.  Detective Candelaria
also testified that when they first arrived at the house, he noticed a pungent
smell which continued to be present once he was inside the house.  He however failed to mention this in his
report and he agreed with defense counsel that this would be important
information to place in the report.








Special Agent
Phillip Austin Land testified that based on his experience, a typical
characteristic of methamphetamine offenders is that their fingertips have a gray
or yellowish stain on them that is very hard to remove.  Special Agent Austin testified that he saw a
red substance in the kitchen, that based on his experience and training, he
believed it to be red phosphorous.  He
also testified that based on his experience and training, the substance in the
kitchen sink was iodine.  He also noticed
Appellant=s
fingertips were a gray-yellowish color and that the house had a distinct smell
which he recognized as the same smell of other methamphetamine labs.  On cross-examination, he testified that he
did not put the information regarding the fingertips and the odor in his
report, although he agreed with defense counsel that this would have been
pretty damaging evidence against the Appellant. 
Additionally, there was no photograph taken of Appellant=s hands.

Special Agent
Liliana McDowell Saenz testified that Appellant=s
hands were dirty and her fingertips were stained and that based on her
experience, people with those stains on their hands are usually involved in
handling iodine.  Special Agent Saenz did
not put this information in her report, although she testified that this would
be considered something important to put on the report.

There was also
evidence regarding a visit to the same residence on May 6, 2002, where at the
time, Mr. Banda and Ms. Gonzalez were not living at the residence.  Several items were found inside the house
indicative of a methamphetamine lab and it was explained to the Appellant that
these items are used to make methamphetamine. 
After speaking to the Appellant for about half an hour, she gave the
officers permission to get rid of those items. 
They also found a poster in one of the bedrooms that read AGot Meth?@








Reviewing the
evidence in the record, we find that there was sufficient evidence
affirmatively linking the Appellant to the red phosphorous and iodine.  Appellant also alleges that the State failed
to prove that the substances were in fact red phosphorous and iodine.  Specifically, Appellant argues that these substances
were never tested and points out that in cases dealing with controlled
substances, there is always testing done of the controlled substance.  The State responds that under Rule of
Evidence 701, the officers testimony is admissible to assist the fact finder in
determining whether a substance is what the State alleges it to be.

Texas Rule of
Evidence 701 states:

If the witness is not
testifying as an expert, the witness=
testimony in the form of opinions or inferences is limited to those opinions or
inferences which are (a) rationally based on the perception of the witness and
(b) helpful to a clear understanding of the witness=
testimony or the determination of a fact in issue.  

 

The record before us contains the
testimony of drug analyst for the Texas Department of Public Safety John
Janczak who testified that he was testing for methamphetamine but did not test
for red phosphorous or iodine.  He
testified that he did not have the capabilities in the lab to exclusively
identify those chemicals.  He also
provided testimony regarding iodine.  He
testified that iodine can be in a liquid form or in crystalline form.  He testified that Exhibit 7 was a liquid form
of iodine.  He testified that to make
methamphetamine, you could get some of the ingredients from cold tablets such
Sudafed and red phosphorous can be extracted from a matchbook=s striking pad and that you of course
also needed iodine.  He also testified
that filtering of the red phosphorous is often done with coffee filters.  He also testified that Red Devil lye is
commonly used in the process as well.  He
testified that he=s never
come across another substance that looks like red phosphorus.  There was also additional testimony provided
by the officers regarding the substances they observed and that based on their
experience and training, they believed the chemicals to be red phosphorous and
iodine.








Given all the
testimony regarding the chemicals found in Appellant=s
home, we find that the State provided sufficient evidence to prove that the
substances were in fact red phosphorous and iodine.  After reviewing the evidence in the light
most favorable to the verdict, we find that a rational trier of fact could have
found the essential elements of the offenses beyond a reasonable doubt.  We additionally find that the evidence was
not so weak as to be clearly or manifestly unjust, nor is it contrary to the
overwhelming weight of the evidence. 
Issues One and Two are overruled.

In Issue Three,
Appellant argues that the trial court erred in allowing the State to present
evidence of extraneous offenses committed by the Appellant without notice being
given to the Appellant, and in so doing, denied the Appellant a right to a fair
trial.  In Issue Four, Appellant argues
that the trial court erred by allowing the State to present evidence of an
extraneous nature that was more prejudicial than probative thereby denying
Appellant of a right to a fair trial. 
The State contends that Appellant did not preserve these issues for
review because she objected initially to the testimony concerning the
extraneous offense, but then she did not ask for a running objection.  We agree.








In order to
preserve error, a party must make a timely and specific objection. Tex.R.App.P. 33.1.  Further, a party must continue to object
every time inadmissible evidence is offered. 
Ethington v. State, 819 S.W.2d 854, 858 (Tex.Crim.App. 1991); Gillum
v. State, 888 S.W.2d 281, 285 (Tex.App.-‑El Paso 1994, pet. ref=d); Tex.R.App.P.
33.1.  Error in the admission of evidence
is cured when the same evidence is admitted elsewhere without objection.  Ethington, 819 S.W.2d at 858; Hudson
v. State, 675 S.W.2d 507, 511 (Tex.Crim.App. 1984). To preserve error,
Appellant could have requested a running objection, or objected outside the
presence of the jury to all the testimony he deemed objectionable as permitted
by Tex.R.Evid. 103(a)(1).  See Ethington, 819 S.W.2d at 858‑59;
Gillum, 888 S.W.2d at 285; Rawlings v. State, 874 S.W.2d 740, 742
(Tex.App.‑-Fort Worth 1994, no pet.); Mack v. State, 872 S.W.2d
36, 38 (Tex.App.-‑Fort Worth 1994, no pet.).

Here, after
defense counsel made a timely objection to a specific prosecution question
directed at Special Agent Falkner=s
testimony in the presence of the jury, she failed to continue objecting to
other questions which elicited the extraneous offense evidence.  When Special Agent Saenz was asked a specific
question regarding the same events, defense counsel made another timely
objection, but again failed to continue to object to the following questions
regarding the extraneous offense.  In so
doing, she allowed the same evidence to come in without objection.  In both instances, defense counsel did not
utilize either of the alternate methods of preserving error, by making a
running objection, or getting a court ruling to offered testimony out of the
jury's presence.  We hold that Appellant
did not preserve any error which may have occurred by admitting the officers'
testimony of the May 6 incident.  We
overrule Issues Three and Four.  








In Issue Five,
Appellant contends that the trial court committed error by including the
following sentence in the definitions section of the jury charge:  A[t]he
list of immediate precursors includes iodine and red phosphorous.@ 
Appellant asserts that A[n]ot
only is that an untrue statement but by including that statement in the Court=s Charge, the jury will conclude that
the State doesn=t have to
prove that element of the indictment.@  At trial, the Appellant lodged the objection
to the inclusion of this statement in the jury charge on the grounds that there
was no evidence presented at trial that it was illegal to possess either of
these chemicals and no evidence as to the fact that these two substances are
immediate precursors.  On appeal, Appellant=s complaint is that the definition was
an improper opinion on the weight of the evidence.  Appellant has failed to preserve this issue
on appeal because this complaint on appeal does not comport to the objection
made at the trial.  See Broxton v. State,
909 S.W.2d 912, 918 (Tex.Crim.App. 1995).

When an Appellant
alleges jury charge error on appeal, our first task is to determine whether
error actually exists in the charge.  Hutch
v. State, 922 S.W.2d 166, 170 (Tex.Crim.App. 1996); Almanza v. State,
686 S.W.2d 157, 171 (Tex.Crim.App. 1985)(Opin. on reh=g).  If there is jury charge error, we then must
determine if the error caused sufficient harm to warrant reversal.  Hutch, 922 S.W.2d at 170-71; Almanza,
686 S.W.2d at 171.  Appellant=s objection at the trial court does not
comport with the issue raised on appeal and therefore, we treat Appellant=s complaint as thought she did not
object to the claimed charge error at trial. 
When error has not been properly preserved, we will reverse only if the
error is so egregious and created such harm that the appellant was denies a
fair and impartial trial.  Arline v.
State, 721 S.W.2d 348, 351 (Tex.Crim.App. 1986); Almanza, 686 S.W.2d
at 171.  A determination of egregious
harm requires that we examine the charge as a whole, the state of the evidence,
the argument of counsel, and any other relevant information revealed by the
record of the trial as a whole.  Almanza,
686 S.W.2d at 171; see also Hutch, 922 S.W.2d at 171.








In reviewing the
jury charge for any alleged error, an appellate court must examine the charge
as a whole and not as a series of isolated and unrelated statements.  Dinkins v. State, 894 S.W.2d 330, 339
(Tex.Crim.App. 1995), cert. denied, 516 U.S. 832, 116 S.Ct. 106, 133
L.Ed.2d 59 (1995).  The function of the
jury charge is to instruct the jury on the law applicable to the case.  Tex.Code
Crim.Proc.Ann. art. 36.14 (Vernon Supp. 2004-05).  A trial court has broad discretion in
submitting proper definition and explanatory phrases to the jury.  Macias v. State, 959 S.W.2d 332, 336
(Tex.App.--Houston [14th Dist.] 1997, pet. ref=d).  If a term or work is statutorily define, the
trial court must submit the statutory definition to the jury.  See Arline, 721 S.W.2d at 352 n.4
(statutorily defined word must be included in the charge as apart of the law
applicable to the case); Roise v. State, 7 S.W.3d 225, 242
(Tex.App.--Austin 1999, pet. ref=d)
(statutory definition should be submitted).

In this case,
whether red phosphorous and iodine were immediate precursors was not a question
of fact to be resolved by the trier of fact. 
Whether a chemical is a immediate precursor must be determined in
consideration of the list put out by the Texas Health Commissioner.  Tex.R.Evid.
204 states:

A court upon its own motion may, or
upon the motion of a party shall, take judicial notice of the ordinances of
municipalities and counties of Texas, of the contents of the Texas Register . .
.  The court=s
determination shall be subject to review as a ruling on a question of law. 

 

In this case, the jury charge
instruction Appellant complains of was an instruction in accordance with the
Texas Register.  The extra sentence
declaring red phosphorous and iodine as immediate precursors was an extension
of the definition of immediate precursors. 
The Appellant has failed to show and we do not find any error in the
jury charge.  As such we overrule Issue
Five.

Accordingly, we
affirm the trial court=s
judgment.

 

 

 

August
31, 2005

DAVID WELLINGTON
CHEW, Justice

 

Before Barajas, C.J., McClure, and Chew, JJ.

 

(Publish)