**Opinion filed June 13, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00166-CR
_____

## LUKE EDWARD BADURA, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 266th District Court**

**Erath County, Texas**

**Trial Court Cause No. CR13447**

### M E M O R A N D U M   O P I N I O N

The jury convicted Luke Edward Badura of burglary of a habitation with intent to commit sexual assault. The jury assessed Appellant's punishment at confinement for forty-seven years and a $5,000 fine. The trial court sentenced Appellant accordingly. We affirm.

*Issues on Appeal*

Appellant does not challenge the sufficiency of the evidence to support his conviction. He presents two issues for review. In his first issue, Appellant contends that the trial court erred when it allowed a witness to testify that Appellant made sexual advances toward her while they were on a date because the advances did not involve a sexual assault or a threat of a sexual assault of the witness. Appellant asserts that the admission of this testimony violated Rule 404(b) of the Texas Rules of Evidence. In his second issue, Appellant contends that the trial court erred when it allowed the same witness to testify regarding the feelings she had as a result of Appellant's sexual advances toward her and the actions she took to protect herself from Appellant as a result of his sexual advances. Appellant asserts (1) that this testimony was not relevant to any issue in the case and that, therefore, the testimony was inadmissible under Rule 402 of the Texas Rules of Evidence; (2) that the probative value of the testimony, if any, was outweighed by its prejudicial effect and that, therefore, the testimony was inadmissible under Rule 403 of the Texas Rules of Evidence; and (3) that the admission of this testimony violated Rule 404(b) of the Texas Rules of Evidence.

*The Charged Offense*

The indictment alleged that, on or about June 8, 2010, Appellant "did then and there, with intent to commit the felony offense of sexual assault, enter a habitation, without the effective consent of Sam (pseudonym), the owner thereof."[1] Appellant's counsel stated during his opening statement that "we expect the evidence to show -- we have to concede right from the outset, we expect the evidence to be pretty compelling that [Appellant] entered into this home." Similarly, Appellant's counsel acknowledged during his closing argument that

---

[1]Sam's actual name was disclosed and used during trial. However, we will refer to her as "Sam" in this opinion to protect her identity.

2

"[t]he [S]tate has presented a compelling case regarding the fundamental elements of burglary of a habitation." Appellant's counsel stated that the State had presented compelling evidence that Appellant had entered the home. However, Appellant's counsel argued that, based on the evidence, reasonable doubt existed as to whether Appellant entered the home with the intent to commit sexual assault. Thus, the primary issue at trial was whether Appellant intended to commit sexual assault when he entered the home.

The trial court charged the jury on the offense of burglary of a habitation with intent to commit sexual assault. The trial court also charged the jury on what it considered to be the lesser included offense of burglary of a habitation by the commission or attempted commission of an assault. The jury found Appellant guilty of the offense of burglary of a habitation with intent to commit sexual assault.

*The Evidence at Trial*

Although Appellant does not challenge the sufficiency of the evidence, we will summarize the evidence to provide context for the issues on appeal. During the night of June 7, 2010, Sam was at her house in Stephenville with Carly.[2] They were watching television in Sam's bedroom. Sam's friend, Armando, called her and told her that he and Bryce wanted to borrow a movie from her. Carly unlocked the front door of the house so that Armando and Bryce could come into the house when they arrived. Armando and Bryce arrived at Sam's house at about midnight, and they stayed until about 1:00 a.m. Sam and Carly did not lock the front door when Armando and Bryce left.

After Armando and Bryce left, Sam and Carly watched television in Sam's bedroom. They were in Sam's bed as they watched. Sam's car was the only vehicle that was parked at the residence. It had a sorority sticker on the back

---

[2]Carly is also a pseudonym.

windshield.  About fifteen minutes after Armando and Bryce left, Sam and Carly heard the front screen door open and shut.  Sam thought that the wind had caused the door to open and shut or that Armando and Bryce had returned.  A few minutes later, Sam and Carly heard what sounded like the rustling of a Wal-Mart sack coming from the living room.  They thought that Armando and Bryce had come back to the house.  A few minutes later, a man arrived at one of the doorways to Sam's bedroom.  He stood in the doorway.  He was wearing a mask, a long-sleeved camouflage shirt, blue jeans, and work boots.  He was breathing heavily, and he did not say anything.  Sam and Carly both thought that Armando and Bryce were playing a joke on them.  Earlier, Armando had asked them "what they were thinking" when they left the door unlocked.

Carly asked the man what he wanted from Sam and her.  He did not say anything.  The man had a roll of duct tape with him.  He tore strips of tape off the roll and stuck them to the dresser in Sam's bedroom.  Carly still believed that someone was playing a joke on them.  She picked up her phone so that she could call Armando.  However, the man grabbed her by the arm and took her phone from her.  Sam attempted to hide her cell phone, but the man took it away from her.  As he was retrieving Sam's phone, the man dropped the roll of duct tape into Carly's lap.  Carly held onto the tape.  The man grabbed Carly's arm and twisted it.  She let go of the tape.  At this point, Sam and Carly knew that no one was playing a joke on them.  They were terrified.  Sam and Carly thought that the man was going to kill or rape them.  Carly again asked the man what he wanted from them.  He did not say anything.  The man put the cell phones on the ground by the doorway.  Carly told him that she had money in her purse and that he could take the flat screen television.  Sam asked the man why he was breathing so hard.  He did not respond.  At that time, Sam and Carly had no idea who the man was.

4

The man told Sam and Carly to get on the ground. Carly told him that she would not get on the ground for him. The man again told Sam and Carly to get on the ground. Carly said "FU, I'm not getting on the ground for you." Sam and Carly jumped off the bed, looked at each other, and ran out the separate bedroom doors. Carly went to the kitchen door that led to the backyard, but she did not get it open. Sam ran to the front door. The man ran after Sam. The man grabbed her and pushed her to the ground. Carly ran to help Sam. Carly and Sam ran into each other in the house. They ran to the kitchen door but could not unlock it. The man was in the kitchen area with them. Ultimately, Sam and Carly ran out the front door of the house. They ran to a neighbor's house. The man ran away in a different direction. He did not take anything from the house other than Sam's and Carly's cell phones. Carly used the telephone at the neighbor's house to call the police.

The police arrived at Sam's house about five minutes after Carly called them. Sam and Carly met the police at Sam's house. Sam told the police that she did not know who the intruder was. However, after thinking about it, Sam believed that the intruder's voice sounded like the voice of a man who had identified himself to her as "Luke" at a swimming pool at an apartment complex. Sam testified that the man had approached her on three separate occasions at swimming pools. Sam said that the man was awkward at the swimming pools. On the second occasion, the man attempted to rub suntan lotion on Sam's legs. Sam immediately pulled her legs away from him. The man told Sam that her legs were so smooth that she should be a stripper. The last incident at a swimming pool occurred on June 6, 2010. On that occasion, "Luke" approached Sam and asked her whether she remembered him. She told him that she did not remember him. He then walked away from her. Sam and her friends referred to "Luke" as the "creeper guy" based on his conduct at the swimming pools.

The police showed a picture of Appellant to Sam. She identified Appellant as being "Luke" from the swimming pool. The evidence showed that Appellant lived four blocks away from Sam. During her testimony, Sam identified Appellant as being the man at the swimming pool.

Stephenville Police Officer Jason Schipper was dispatched to Sam's house on a home invasion call on June 8, 2010, at about 2:30 a.m. Officer Schipper and Lieutenant Jason Halsey responded to the dispatch. The officers were told that the suspect was wearing a long-sleeved camouflage shirt and some type of mask. Officer Schipper found a latex glove on the couch in the living room. Sam and Carly told him that the glove did not belong to them. In one bedroom, Officer Schipper found a roll of duct tape on the dresser and two pieces of duct tape stuck to the dresser. Sam and Carly told him that the intruder had had the roll of duct tape, that he had torn pieces off the roll, and that he had stuck the pieces to the dresser. The officers testified that items to conceal identity, such as masks, and items to tie or to bind the victim, such as duct tape, are commonly used by perpetrators of sexual assaults.

Sergeant Curtis Dees was assigned to the Criminal Investigations Division. He was dispatched to Sam's house on June 8, 2010, at 3:42 a.m. Officer Schipper told him that Appellant was a possible suspect. Sergeant Dees requested assistance from Sergeant Russell Ford. Sergeant Dees and Sergeant Ford went to Appellant's residence. Appellant was at his residence. Sergeant Ford interviewed Appellant in the presence of Sergeant Dees. During the interview, Appellant denied that he had gone into Sam's and Carly's house. Instead, Appellant gave Sergeant Ford an alibi that he had been with Sydney Wilcox at the time of the invasion into Sam's house. Appellant told Sergeant Ford that he had been on a date with Sydney Wilcox the previous night. Appellant said that he had met Wilcox for the first time earlier that day, that he had gone to Wilcox's place of employment, that they had made plans

to go out later in the evening, that they had gone to his house to watch a movie, that they had later gone to a club and had had drinks there, that they had gone to Wilcox's residence, that he and Wilcox had had sex, and that Wilcox had taken him home at about 2:00 a.m. Sergeant Ford asked Appellant whether he was willing to go to the police station to talk there. Appellant did not want to go to the police station.

Gene Simpson lived across the street from Appellant. As the officers were leaving Appellant's house, Simpson approached them. Simpson told them that he had found a cell phone in his backyard earlier that morning. The officers went to Simpson's house. They collected the phone that Simpson had found, and they also found another cell phone in Simpson's backyard. These phones belonged to Sam and Carly and were the phones that the intruder had taken from Sam's house.

Joyce Marek was a crime scene technician for the Waco Police Department. She was in charge of the Department's fingerprint lab. Marek detected a readable fingerprint on one of the pieces of duct tape that was found on Sam's dresser. She photographed the fingerprint and gave the picture to JoAnne Guerico, who was an AFIS technician for the Waco Police Department. Guerico testified that the fingerprint depicted in the picture matched a fingerprint of Appellant's left middle finger that Guerico received from AFIS. Guerico testified that she took a set of fingerprints from Appellant before she testified. She said that the fingerprint that she took of Appellant's left middle finger matched the fingerprint that was depicted in Marek's picture.

Before the State presented Wilcox as a witness, it sought a ruling from the trial court outside the presence of the jury as to the admissibility of her testimony. The prosecutor stated that he anticipated that Wilcox would testify that she was with Appellant until about 11:15 p.m. on June 7, 2010 and that, therefore, her testimony would contradict Appellant's statement to the police officer that he had

7

been on a date with her until 2:00 a.m. The prosecutor informed the trial court that Wilcox was prepared to testify that, on June 7, Appellant "inappropriately approached her sexually, asked for oral sex, tried to cajole her into giving him sex, all of which she refused." The prosecutor also stated that Wilcox would testify that "when she dropped him off at home the first thing she did was dart back to her house, check all of her windows and doors, let all of her dogs in the room, and grabbed a baseball bat to protect herself from this particular [Appellant], [because] she felt so unnerved by his conduct." The prosecutor stated that the State intended to offer Wilcox's testimony in response to Appellant's argument that he lacked the requisite intent to commit sexual assault as alleged in the indictment. The State's position was that Wilcox's testimony about Appellant's conduct and her reactions to his conduct was admissible to prove Appellant's intent, preparation, plan, and motive under Rule 404(b) of the Rules of Evidence.

In response to the prosecutor, Appellant's counsel stated that Appellant had no objection to Wilcox's testimony regarding "her activities with [Appellant] on the evening of June the 7th or even things about him that she observed." Appellant's counsel then stated that "what we do have concerns about is testimony concerning her activities after she was no longer in the presence or in observation of [Appellant]." Appellant's counsel objected to such testimony on relevancy grounds. He asserted that the testimony was not "particularly relevant" to a determination of Appellant's state of mind at the time of the offense. Appellant's counsel also stated that testimony about Wilcox's activities after being with Appellant was "simply designed to inflame the jury."

The trial court overruled Appellant's objection to Wilcox's testimony. The trial court ruled that the testimony was admissible under Rule 404(b) as it related to intent, plan, or preparation.

8

Wilcox testified that she was a waitress at Jake & Dorothy's Cafe. Wilcox met Appellant through her Myspace account. She said that Appellant contacted her on Myspace by e-mail. On June 7, 2010, Appellant showed up at Jake & Dorothy's and introduced himself to Wilcox. Wilcox testified that she and Appellant made plans to watch a movie at his house that evening. Wilcox went to Appellant's house at about 6:00 p.m. Appellant lived about four houses away from Wilcox's house.

Wilcox testified that she and Appellant watched part of a movie. They then went to the Barcelona, which was also known as the Bar C. Wilcox drove Appellant to the Bar C in her car. While they were there, Appellant drank almost two pitchers of beer. Wilcox bought the beer. Wilcox testified that Appellant was shy when it came to talking to her. She said that Appellant gawked and blatantly stared at their waitress. Wilcox felt "less comfortable" with Appellant due to his actions toward the waitress. At one point, Appellant told Wilcox that, if he did not feel like he was in control of a situation, he was not very happy. Wilcox's friend, Kim, came to the Bar C at about 10:00 p.m. Wilcox testified that, after Kim arrived, Appellant seemed very unhappy that Wilcox's attention was split between him and Kim. Wilcox said that she and Appellant stayed at the Bar C until 10:30 p.m.

Wilcox said that she needed to check on her dogs at her house before she drove Appellant home. Wilcox drove Appellant to her house. Wilcox let her dogs out of the house. She said that Appellant started making sexual advances toward her, "as far as speech and certain movements." Wilcox testified that Appellant wanted sex and that he was very persistent about it. Appellant asked her if they were going to have sex. Wilcox responded, "No." Appellant then asked her for a "blowjob." She told him, "No." Appellant told Wilcox that he wanted to take her in the other room. He asked her whether she had any condoms. Appellant also

told her that he wanted to take off her underwear with his teeth. Wilcox testified that Appellant's actions made her feel very uncomfortable, especially because she had already told him, "No."

Appellant told Wilcox that he was really, really tired. Wilcox testified that Appellant walked into her room and flopped down on the bed. Wilcox told Appellant that he could take a power nap for a minute or two while she checked on her dogs. She told Appellant that she was going to take him home as soon as she got back inside. Wilcox let her dogs back inside the house. Wilcox checked her windows and doors to make sure that they were locked because, during the course of the night, she felt increasingly uncomfortable around Appellant. Wilcox said that Appellant did not like the word, "No." Wilcox was concerned about the comment Appellant had made at the Bar C about not being happy when he was not in control. Wilcox told Appellant to get up and get his stuff. She did not want him to leave anything at her house because she did not want him to have a reason to come back to her house. Wilcox said that Appellant "was literally right around the corner" from her.

Wilcox and Appellant got into Wilcox's car, and she drove him home. Wilcox said that she locked the windows and doors at her house before they left because Appellant might be able to get back to her house faster on foot than she could get there in her car. When they got to Appellant's house, Appellant asked Wilcox for $5 to buy cigarettes. She gave him the money. Appellant got out of the car, slammed the door shut, walked in front of the car, turned toward Wilcox with a big smile on his face, waved at Wilcox, and then went inside his house. Wilcox said that she dropped Appellant off at his house at about 11:13 p.m. because she arrived back at her house at 11:15 p.m.

Wilcox testified that she locked the door to her house, got a baseball bat, put the bat next to her bed, and let her dogs sleep in her room with her that night. She

said that she felt "incredibly uncomfortable" as a result of Appellant's behavior and that it was "very nerve rattling" to know that Appellant was only four houses away from her.

*Admissibility of Evidence*

Appellant contends in his first issue that the trial court erred when it admitted Wilcox's testimony that Appellant made sexual advances toward her. We review a trial court's decision to admit evidence under an abuse of discretion standard and will not reverse that decision absent a clear abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). A trial court abuses its discretion only when its admissibility decision lies outside the zone of reasonable disagreement. *Apolinar*, 155 S.W.3d at 186.

On appeal, Appellant argues that the admission of evidence of his sexual advances toward Wilcox violated Rule 404(b) of the Rules of Evidence. During the guilt/innocence phase of a trial, Rule 404(b) governs the admissibility of evidence of "other crimes, wrongs or acts." Rule 404(b); *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1991); *Gately v. State*, 321 S.W.3d 72, 81–82 (Tex. App.—Eastland 2010, no pet.). Rule 404(b) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person to show action in conformity therewith." However, Rule 404(b) allows evidence of other crimes, wrongs, or acts if the evidence has relevance apart from character conformity. For example, such evidence may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Rule 404(b); *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005); *Gately*, 321 S.W.3d at 81.

Appellant did not lodge any objections at trial to Wilcox's testimony that he made sexual advances toward her. Instead, Appellant's counsel informed the trial

11

court that Appellant had no objection to Wilcox's testimony regarding "her activities with [Appellant] on the evening of June the 7th or even things about him that she observed." To preserve error for appellate review, the complaining party must make a timely, specific objection in the trial court and obtain a ruling on the objection. TEX. R. APP. P. 33.1(a); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995). Therefore, Appellant did not preserve his first appellate issue for review.

Even if appellant had objected to Wilcox's testimony that Appellant made sexual advances toward her, the trial court would not have abused its discretion by admitting the testimony. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." TEX. R. EVID. 401. The primary issue at trial was whether Appellant intended to sexually assault Sam. Evidence that Appellant made sexual advances toward Wilcox and that she rejected his advances was relevant to determining Appellant's intent and his state of mind when he entered Sam's house. The trial court correctly ruled that the evidence was admissible to prove Appellant's intent. Additionally, Wilcox's testimony about Appellant's sexual advances and her rejection of those advances was relevant and admissible because it contradicted Appellant's statement to Sergeant Ford that he and Wilcox had had sex. Appellant's first issue is overruled.

Appellant contends in his second issue that the trial court erred when it allowed Wilcox to testify (1) about how she felt during and after her date with Appellant as a result of his sexual advances toward her and (2) about the steps she took during and after the date to protect herself from Appellant. On appeal, Appellant argues that the admission of this testimony violated Rule 404(b). At trial, Appellant raised only a relevancy objection. As stated by Appellant's counsel at trial, the relevancy objection was limited to testimony by Wilcox that

concerned "her activities after she was no longer in the presence or in observation of [Appellant]." Such a relevancy objection does not preserve error on a Rule 404(b) claim. *Medina v. State*, 7 S.W.3d 633, 643 (Tex. Crim. App. 1999). In addition, the issue on appeal must comport with the objection that was made at trial. *Wilson*, 71 S.W.3d at 349; *Broxton*, 909 S.W.2d at 918. Because Appellant failed to raise a Rule 404(b) objection at trial, he failed to preserve his Rule 404(b) claim for review.

The trial court overruled Appellant's relevancy objection to Wilcox's testimony about the feelings that she had and the actions that she took following her date with Appellant. The testimony that related to Wilcox's feelings and the actions she took, both during and after her date with Appellant, was relevant to explain the nature and persistence of Appellant's sexual advances toward Wilcox. Without the testimony, the jury could not have fully understood the nature of Appellant's conduct toward Wilcox. The testimony was relevant to explain Appellant's intent and state of mind at the time of the offense. Appellant made the sexual advances toward Wilcox only about two hours before he entered Sam's residence. We cannot conclude that the trial court abused its discretion when it overruled Appellant's relevancy objection.

Appellant also contends in his brief that the probative value, if any, of Wilcox's testimony about her feelings and the actions she took to protect herself was outweighed by its prejudicial effect. *See* TEX. R. EVID. 403. However, Appellant did not raise a Rule 403 objection at trial. A relevancy objection does not preserve error on a Rule 403 complaint. *Sony v. State*, 307 S.W.3d 348, 356 (Tex. App.—San Antonio 2009, no pet.). Appellant failed to preserve his Rule 403 complaint for appellate review. Appellant's second issue is overruled.

*This Court's Ruling*

We affirm the judgment of the trial court.

TERRY McCALL

JUSTICE

June 13, 2013

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.