# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00445-CR

---

**Christopher Michael Crim, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. CR2016-215, THE HONORABLE DWIGHT E. PESCHEL, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Christopher Michael Crim was convicted of four counts of sexual assault of a child and one count of indecency with a child by contact and was sentenced to eight years' imprisonment for each offense. *See* Tex. Penal Code §§ 12.33, 21.11(a)(1), 22.011(a)(2).[1] The alleged victim in all five counts was C.C. who was thirteen and fourteen years old during the alleged abuse. On appeal, Crim asserts that the trial court erred by excluding testimony regarding C.C.'s cellphone's contents. We will affirm the trial court's judgments of conviction.

## BACKGROUND

Crim began dating C.C.'s mother, Jacquelyn Taylor, shortly after she gave birth to C.C., and the couple ultimately married. The couple later had a biological son and adopted two of Taylor's nieces, and Crim adopted C.C. For years, the family lived in San Antonio, and C.C.

---

[1] The indictment alleged two additional counts for sexual assault of a child and one count of aggravated sexual assault of a child, but the State later abandoned those charges.

became friends with Emma Schafer during that time. The couple decided to move to Comal County to lower their expenses. While the family lived in Comal County, C.C. befriended Courtney Groesbeck. One day, Groesbeck told her mother that she was concerned that Taylor might be physically abusing C.C. based on something that C.C. had mentioned. After talking with Groesbeck, Groesbeck's mother called Taylor to report what she had heard.

Shortly thereafter, Taylor asked C.C. about what she told Groesbeck and about some of her recent behavior. C.C. denied telling Groesbeck that Taylor had abused her but told Taylor that Crim had been molesting her for the last several months. Taylor questioned C.C. about the allegations, called Crim on the phone, told him to return home because there was a family emergency, and called the police. One of the responding officers recorded the interaction between Taylor and Crim when Crim arrived at the home and a later interaction among Taylor, Crim, and C.C. That recording was admitted into evidence at trial.

After the police arrived, C.C. was taken to a sexual-assault-nurse examiner (SANE) and to the Children's Advocacy Center where a counselor interviewed her. A recording of the forensic interview was admitted into evidence at trial. After the forensic interview, Detective Danny Dufur interviewed C.C. about the allegations, and a recording of that interview was admitted into evidence at trial. A few weeks after making the outcry, C.C., her siblings, and Taylor all moved into Schafer's home in San Antonio, and Taylor began dating Schafer's father.

During the trial, C.C. testified generally that Crim sexually assaulted her multiple times after they moved to Comal County and provided more specific details regarding three of those incidents. Regarding one of those incidents, C.C. explained that Crim lifted her dress while they were driving to the store in his car, "started touching" her vagina, inserted his finger into her vagina, unzipped his pants, grabbed her hand, placed her hand on his penis, and

2

instructed her to squeeze his penis and move her hand up and down. In addition, C.C. testified that Crim stopped his behavior after she told him that his actions were not appropriate because he was married and because she considered him to be her father, but she also related that Crim told her that the activity was fine because they were not biologically related.

Regarding another incident, C.C. testified that Crim told her to go into his bedroom when Taylor was out of town. When C.C. entered the bedroom, Crim got on top of her on the bed, rubbed his penis on her vagina, and stopped his behavior when she told him to get off of her. In addition, C.C. explained that they were both wearing clothes during this incident. Regarding the third incident, C.C. testified that her younger brother was playing a video game in his bedroom and asked Crim and C.C. to watch him play through the window while they were outside the home. Next, C.C. related that Crim inserted his finger into her vagina while they were outside her brother's bedroom window.

On the recording of her forensic interview, C.C. stated that Crim inserted his finger into her vagina and tried to have sex with her about "nine or ten" times while they lived in Comal County. In addition, C.C. discussed the three incidents summarized above, but there were some discrepancies between the interview and her testimony. For example, when talking about the incident in Crim's bedroom, C.C. stated in her interview that Crim removed his pants and her pants and rubbed his penis directly on her vagina but testified that they were fully clothed during the incident. Moreover, C.C. described two other incidents in which Crim touched and then inserted his finger into her vagina: once while they were outside in the front yard and once while she was under a blanket on the couch in the living room.

On the recording of her interview by Detective Dufur, C.C. discussed the five incidents summarized above and mentioned that the incidents all occurred after they moved to

3

Comal County. Additionally, C.C. repeated her assertion that Crim abused her nine or ten times. Further, C.C. stated that she told her friends Schaffer and Groesbeck about the abuse before telling Taylor.

During the trial, the State called several witnesses to the stand in addition to C.C., including Taylor, Detective Dufur, and the SANE. In his case in chief, Crim called multiple witnesses, including his mother, Schafer, Groesbeck, and another officer involved in the investigation. In addition, Crim elected to testify.

After considering the evidence presented at trial, the jury found Crim guilty of four counts of sexual assault of a child and one count of indecency with a child by contact. Crim appeals his judgments of conviction.

## DISCUSSION

On appeal, Crim contends that the trial court erred by sustaining the State's objection to testimony regarding the contents of C.C.'s cellphone. C.C.'s cellphone was mentioned during Crim's cross-examination of her. Specifically, Crim asked C.C. whether she had any pornography on her cellphone, and the State objected. In a hearing held outside the presence of the jury, C.C. admitted that she and her friends used her cellphone to search for pornography and that some of the searches were for sexual activity among family members. C.C. also explained at the hearing that she looked at the pornographic material to educate herself about sex, that she saw male and female genitalia on the videos, and that she had no knowledge of sexual activities except from what she learned by watching pornography and from what Crim did to her. After C.C. finished testifying, Crim argued that C.C. watched those videos shortly before making her outcry and that the evidence related to her ability to make the outcry.

4

Further, Crim asserted that the evidence shows "preparation, . . . planning, knowledge and absence of mistake" regarding C.C.'s outcry. In response, the State argued that the evidence was inadmissible under Rule of Evidence 412 because that Rule prohibits the admission of evidence regarding a sexual-assault victim's past sexual behavior. *See* Tex. R. Evid. 412. Further, the State asserted that most of the videos involved sexual activity that was inconsistent with the conduct C.C. described in her outcry and that the evidence was unduly prejudicial. After considering the parties' arguments, the trial court sustained the State's objection.

During a later hearing outside of the presence of the jury, Detective Dufur testified that he discovered pornography on C.C.'s cellphone, that some of the pornography searches listed in the phone's history were performed a few days before the outcry, and that it was possible that C.C. learned about some types of sexual activity by watching the videos. After Detective Dufur finished testifying, Crim urged that he should be able to question witnesses about the pornography viewed near the date of the outcry because the evidence related to C.C.'s knowledge about sexual activity. In response, the State contended that the evidence should not be admitted because some of the searches were done by C.C.'s friends and because the evidence was inadmissible under Rule 412. As it did before, the trial court concluded that the evidence was inadmissible.

In several related arguments on appeal, Crim contends that the trial court erred by sustaining the State's objection. First, Crim contends that the trial court's ruling denied him due process and violated his confrontation rights by denying him the ability to fully confront his accuser through cross-examination. *See* U.S. Const. Amends. V, VI. Building on these alleged constitutional errors, Crim contends that even if Rule 412 applied in the circumstances present here, the evidence was admissible under the enumerated exception in Rule 412 authorizing the

5

admission of evidence of a victim's past sexual behavior when it "is constitutionally required to be admitted." *See* Tex. R. Evid. 412(b)(2)(E).

However, Crim did not make these constitutional arguments before the trial court. To preserve a complaint for appellate review, the record must show, among other things, that the complaint was made to the trial court. *See* Tex. R. App. P. 33.1(a); *see also Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) (stating that "the point of error on appeal must comport with the objection made at trial"); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (noting that objection stating one legal theory may not be used to support different legal theory on appeal). Accordingly, we must conclude that Crim failed to preserve his constitutional arguments for appellate consideration. *See Oliver v. State*, No. 03-19-00725-CR, 2020 WL 5105209, at *2 (Tex. App.—Austin Aug. 27, 2020, pet. ref'd) (mem. op., not designated for publication) (observing that confrontation complaints are "subject to preservation requirements" and concluding that defendant failed to preserve confrontation complaint by not raising complaint with trial court); *Johnson v. State*, No. 03-12-00006-CR, 2012 WL 1582236, at *3 (Tex. App.—Austin May 4, 2012, no pet.) (mem. op., not designated for publication) (explaining that "[n]umerous constitutional rights, including those that implicate a defendant's due-process rights, may be forfeited for purposes of appellate review unless properly preserved" and determining that defendant failed to preserve due-process complaint).

In his next set of arguments, Crim contends that the trial court erred by concluding that Rule 412 prohibited the admission of the evidence on C.C.'s phone. More specifically, Crim argues that watching and searching for pornography do not qualify as "sexual behavior" and, therefore, are not prohibited under Rule 412. *See* Tex. R. Evid. 412. Further, Crim highlights that C.C. testified outside the presence of the jury that she learned about sex

6

through her interactions with him and by watching pornography but that the jury only heard testimony indicating that she learned about sex through her interactions with him, leaving the jury "with a false impression of C.C. as a naïve girl who had no knowledge of sexual matters, until she was assaulted by" him. As support for this characterization of the evidence, Crim points to testimony from C.C. in which she explained that she had never seen a penis before she saw his penis and was unfamiliar with female genitalia.

Additionally, Crim contends that the evidence from C.C.'s cellphone was necessary to establish his defense that she fabricated the events in an effort "to get out of her current living situation" and to "provide the jury with an alternative source for the descriptions of the sexual abuse that allegedly involved him." *See Matz v. State*, 989 S.W.2d 419, 423 (Tex. App.—Fort Worth 1999) (explaining that pornography provided "another explanation for T.M.'s lack of innocence about sexual matters"), *rev'd on other grounds*, 14 S.W.3d 746 (Tex. Crim. App. 2000); *see also Hammer v. State*, 296 S.W.3d 555, 561-62 (Tex. Crim. App. 2009) (explaining that Rules of Evidence "should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant" in sexual-assault cases). Moreover, Crim contends that without this evidence, he was effectively prevented from presenting his defense.

Even if the trial court abused its discretion by concluding that the evidence was inadmissible, we would be unable to sustain Crim's issue on appeal. "Error in the exclusion of evidence is non-constitutional error subject to a harm analysis under Rule of Appellate Procedure 44.2(b)."[2] *Jones v. State*, No. 01-15-00717-CR, 2019 WL 3558991, at *6 (Tex. App.—Houston

_____

[2] Building on his assertion that the trial court's ruling violated his constitutional rights, Crim also contends that any harm analysis conducted in this case should be done under the

7

[1st Dist.] Aug. 6, 2019, no pet.) (mem. op., not designated for publication). Under that Rule, the error must be disregarded unless it affected the defendant's substantial rights. *See* Tex. R. App. P. 44.2(b). A substantial right is not affected "when, after examining the record as a whole, the reviewing court has a fair assurance that the error did not influence the jury or had but a slight effect." *McDonald v. State*, 179 S.W.3d 571, 578 (Tex. Crim. App. 2005). In determining whether a defendant's substantial rights were affected, the reviewing "court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *see Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). "The reviewing court may also consider . . . the State's theory and any defensive theories, closing arguments and even voir dire, if applicable." *Motilla*, 78 S.W.3d at 355-56. If the reviewing court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect," then the defendant's substantial rights were not affected. *Id.* at 355 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

---

constitutional-harm standard set out in Rule of Appellate Procedure 44.2(a). *See* Tex. R. App. P. 44.2(a). However, as set out above, Crim did not present his constitutional claims to the trial court. *See Wong v. State*, No. 03-19-00211-CR, 2020 WL 1482457, at *7 n.4 (Tex. App.—Austin Mar. 27, 2020, pet. ref'd) (mem. op., not designated for publication) (rejecting argument that erroneous admission of outcry testimony violated defendant's due process rights and, therefore, was subject to more stringent constitutional-error review, in part, because defendant did not make due-process objection during hearing). Moreover, as set out in more detail in the opinion, the evidence did not form "such a vital portion of the case that exclusion effectively preclude[d] the defendant from presenting a defense." *See Campbell v. State*, 551 S.W.3d 371, 381 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Accordingly, we apply the harm analysis for non-constitutional errors to the trial court's evidentiary ruling. *See* Tex. R. App. P. 44.2(b).

For the reasons that follow, we do not believe that the exclusion of the evidence harmed Crim. First, evidence of Crim's guilt was presented through multiple sources. During the trial, C.C. testified regarding multiple instances of sexual abuse. Although there were some differences in the types of alleged activity described, C.C. provided similar statements regarding abuse committed by Crim in the recordings of her forensic interview and her conversation with Detective Dufur. Similarly, the SANE testified regarding her interview with C.C. and although C.C.'s testimony had some differences from her statement to the SANE, the SANE described incidents similar to the ones discussed in C.C.'s testimony (e.g., that there were about ten incidents, including one in Crim's bedroom, one outside her brother's window, and one in Crim's car).

In addition, a body-camera recording of one of the officers responding to the Crim house after C.C.'s outcry shows C.C. confronting Crim about the allegations and begging him to tell the truth. One of the responding officers testified that Crim "seemed very nervous" and was "pacing back and forth" when he learned of C.C.'s outcry. Moreover, Taylor testified that C.C. stated that Crim had been "molesting" her and that C.C. was sure that the events occurred. Additionally, Detective Dufur explained that he reviewed text messages between C.C. and Schafer during his investigation and that in one of those text exchanges, C.C. stated that Crim had sexually abused her nine or ten times, which Detective Dufur described as being consistent with what she said to the police and in her forensic interview.

Second, although Crim contends that the trial court's ruling prohibited him from attacking the State's theory that C.C. learned of the sexual conduct through the abuse and from pursuing a defensive theory asserting that C.C. learned of the alleged sexual behavior from a source other than him, the State neither emphasized during its closing argument C.C.'s testimony

9

indicating that she was not knowledgeable about sex nor asserted that C.C. could only have learned of the sexual acts that she described through the acts of abuse. Instead, the State argued that C.C.'s various statements in this case were consistent with one another and with her testimony at trial.

Perhaps more importantly, Crim was able to advance an alternative explanation for how C.C. learned of the type of sexual activity at issue. During her cross-examination and in her interview, C.C. stated that the children at her high school in Comal County regularly talked about sex. In his closing argument, Crim referenced C.C's prior statements, argued that she learned through her school friends about the type of sexual activity that she alleged Crim engaged in, and reasoned that the allegations that C.C. made were consistent with inexperienced teenage sexual activity because the allegations did not involve completed sexual acts.

Third, through his opening and closing arguments, his cross-examination of the State's witnesses, and his calling several witnesses to the stand, Crim was able to present, among others, the following three defensive theories: (1) that C.C. was not a credible witness, (2) that C.C. fabricated the allegations to live with her friend Schafer, and (3) that the police did not do a thorough investigation of this case. Regarding the first defensive theory, when Crim cross-examined Taylor, she admitted that it took her months to believe that C.C. was telling the truth about the allegations. Similarly, when the State called C.C.'s friends Groesbeck and Schafer to the stand, they testified that C.C. was not a truthful person, that C.C. had told them about the alleged abuse, and that they did not believe that the allegations were true. During his case-in-chief, Crim's mother also testified that C.C. was not an honest person and that she would lie to get out of trouble, and in his testimony, Crim repeatedly denied the allegations and characterized C.C. as "manipulative" and "devious." In his closing argument, Crim emphasized that C.C.'s

10

two best friends did not believe her accusations, that Taylor did not believe C.C. for months, that there were inconsistencies between C.C.'s testimony and the abuse that she described to others, and that C.C.'s testimony at trial regarding Crim's actions described less serious misconduct (e.g., both parties had their clothes on) than she described to law-enforcement officials and revealed that C.C. was feeling guilty about lying about the abuse.

Regarding the second defensive theory, when Crim questioned Schafer, she testified that C.C. talked about moving into Schafer's home for months before making the outcry and asked Schafer to convince her father to let C.C. move in with them before she made the outcry. Similarly, Schafer explained that within a few days of C.C.'s outcry, C.C. mentioned moving into Schafer's home and that within a few weeks, C.C. and her family moved into Schafer's home. Further, Crim testified that he believed that Taylor and C.C. had set him up, that C.C. repeatedly stated that she wanted to move in with Schafer after the move to Comal County, and that C.C.'s motive in making the accusations was to move back to San Antonio and into Schafer's home. During her cross-examination, C.C. stated that the Comal County neighborhood where she lived was not nice, that she wanted to move back to San Antonio and go to high school with Schafer, that she texted with Schafer about encouraging Schafer's father to date Taylor, that she and her family moved into the Schafer home within a few weeks of the outcry, and that Taylor started dating Schafer's father soon thereafter. In his closing argument, Crim asserted that C.C. made the allegations in order to move back to San Antonio and be with her friend Schafer and highlighted the testimony indicating that C.C. discussed moving in with Schafer before the outcry.

Regarding the third defensive strategy, Crim questioned Detective Dufur about the thoroughness of his investigation, and Detective Dufur admitted that he did not interview

11

Schafer, Groesbeck, or Groesbeck's mother; take any photographs of the car where one of the incidents allegedly occurred; go to the home where C.C. was living and allegedly assaulted; or get a warrant to search Crim's cell phone and other electronic devices. In addition, as set out above, Detective Dufur interviewed C.C. after her forensic interview, and the forensic interviewer testified in her cross-examination by Crim that it was not the best practice to have law-enforcement officers interview child victims. Similarly, another police officer involved in the investigation who was called as a witness by Crim testified that police officers typically do not interview minors because they are not trained in that type of interaction. In his closing argument, Crim asserted that Detective Dufur did not interview key witnesses or thoroughly investigate C.C.'s claims.

Finally, nothing in the testimony about C.C.'s cellphone given by C.C. and Detective Dufur outside the presence of the jury directly contradicted C.C.'s testimony and statements to various law-enforcement officials stating that Crim sexually assaulted her on multiple occasions. And the testimony outside the presence of the jury from those two witnesses was relatively brief compared to the testimony bearing upon Crim's guilt. *See Castillo v. State*, 573 S.W.3d 869, 884 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd) (op. on reh'g) (concluding that any error from exclusion of letters written by witness to her father was harmless because letters did "not contradict her account of molestation" and because it was "unlikely that a jury confronted with [defendant]'s daughter's minimal testimony about the letters would have concluded that their contents were so inconsistent with her testimony that her father molested her as to significantly undermine its credibility").

In light of the preceding, we must conclude that any alleged error stemming from the trial court's decision to exclude testimony regarding C.C.'s cellphone did not have "a

12

substantial and injurious effect or influence in determining the jury's verdict" and therefore did not affect Crim's substantial rights. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Accordingly, even assuming that there was error, any error would be harmless, and we, therefore, overrule Crim's issue on appeal. *See* Tex. R. App. P. 44.2(b).

## CONCLUSION

Having overruled Crim's issue on appeal, we affirm the trial court's judgments of conviction.

_____

Thomas J. Baker, Justice

Before Chief Justice Rose, Justices Baker and Kelly

Affirmed

Filed: December 11, 2020

Do Not Publish

13